Kathryn J. Wild, RN, MPA, CCHP-RN
10580 N. McCarran Blvd, #115, Suite 504, Reno, NV 89503
Phone: 909-720-0961

# Expert Report

## I.   INTRODUCTION

My name is Kathryn J. Wild. My business address is 10580 N. McCarran Blvd, #115, Suite 504, Reno, NV 89503. I was retained by The Law Office of Sanjay S. Schmidt to consult in the case of <u>John Scalia, Individually and as Successor-in-Interest of Decedent Kimberly Morrissey-Scalia v County of Kern, et al.</u>

I am a licensed Registered Nurse with a master's degree in Public Administration and Certified as a Corrections Healthcare Professional - RN by the NCCHC concerning the delivery of specialized nursing care in correctional facilities. I have worked in the field of Corrections Healthcare for over 30 years as a Registered Nurse, and Health Services Administrator responsible for the administration of healthcare, training and supervision of healthcare employees, as well as the formation and implementation of policy applicable to staff who provide healthcare to persons housed in corrections facilities. My Curriculum Vitae and fee schedule are attached. I am retained on behalf of The Law Office of Sanjay S. Schmidt as an expert witness who is knowledgeable and experienced in the training, supervision and monitoring of healthcare administered to prisoners housed in the setting of a correctional facility, including but not limited to the areas of corrections nursing care, corrections healthcare, corrections healthcare administration, corrections healthcare policy formation and implementation, and the implementation and maintenance of policies and procedures that comply with national corrections standards, including but not limited to those by the National Commission on Correctional Healthcare (NCCHC), the American Corrections Association (ACA), and the Prison Rape Elimination Act (PREA).

## II.   MATERIALS REVIEWED

In preparation for forming the opinions expressed below, in addition to my experience in the correctional healthcare field, I have reviewed the following materials:

1. First Amended Complaint, Scalia v. County of Kern et al., 1:17-cv-01097-LJO-JTL, Docket # 15
2. Answer to Plaintiff's First Amended Complaint by Defendants Kern County Hospital Authority and Rowena Blakely, R.N.
3. Answer to Plaintiff's First Amended Complaint by Defendant Randi Allen
4. First Amended Answer to Plaintiff's First Amended Complaint by Defendants County of Kern, Donny Youngblood, Joel Swanson and Misty Miller
5. County of Kern's Responses to Plaintiff's Requests for Production of Documents, Set One, Set Two, Set Three and Set Four
6. Disk Attachment to County of Kern's Responses to Plaintiff's Requests for Production of Documents, exhibits 1 through 9 as produced by the County
    a) Scalia - KCSO Arrest Report SR16-17146
    b) Scalia - Hospital logs

*Scalia v Kern, et al.*

    c) Scalia - KCSO B Control Nights
    d) Scalia - KCSO B Floor Nights
    e) Scalia - KCSO Crime Scene logs
    f) Scalia - KCSO Report # SR16-17969
    g) Scalia - SR16-17969 SII DC (21) Photos
    h) Scalia - Transcript of Interview with Felicia Thornton
    i) Scalia - Transcript of Interview with John Scalia
    j) Scalia - Transcript of Interview with Veronica Jean Navarette
    k) Scalia - CJIS records
    l) Kern County Current Detentions Policies
    m) Scalia - KCSO CAD log SR1617146
    n) Scalia - KCSO SR1617969 cad log KIMBERLY MORRISSEY-SCALIA - from MCW
    o) Scalia - KCSO SR1617146 9-1-1 CALL.WAV
    p) Scalia - KCSO Radio Phone Traffic SR1617969.WAV
    q) Scalia - Deat Review Report - SCELIA - death review info 2016 - from MCW
    r) Scalia - Death Checklist - SCELIA #2151361 - death review info 2017 - from MCW
    s) Scalia - Death Review Report -SCELIA _2151361 - death review info 2016 - from MCW
    a. t) Scalia - Inmate Scelia death reporting forms   2016 - death review info 2016 - from MCW
    t) Scelia correction date letter - death review info 2016 - from MCW
    u) Scalia - Evidence list - from MCW
7. John Scalia Interview at Kern Medical Center
8. Scalia - KCSO Arrest Report SR16-17146
9. Scalia - CJIS records for Felicia Thornton_Redacted
10. Scalia - CJIS records for Veronica Navarette_Redacted
11. Scalia - Coroner's Photos - marked CONFIDENTIAL
12. Scalia - KCSO Supplemental Incident report
13. Scalia - Interview with Navarette.wma
14. Scalia - Interview with Thornton.wma
15. Kern County Hospital Authority's Responses to Plaintiff's Requests for Production of Documents, Set One, Set Two, Set Three and Further Responses to Set Two & Three
16. Serrano Investigative Services Report
17. 85 photos from Serrano Investigator
18. Hall Ambulance Records, Patient Care Report, Scalia, Kimberly
19. Kern Medical Center Records from June 27, 2016-July 1, 2106
20. 7 news articles reporting on the in-custody death of Kimberly Scalia
21. Initial Rule 26 Disclosure Defendants County of Kern, Donny Youngblood, Joel Swanson, Randi Allen and Misty Miller
22. Defendants Kern County Hospital Authority and Rowena P. Blakely, R.N. F.R.C.P. 26 Initial Disclosure
23. Disk attachment to Defendants Kern County Hospital Authority and Rowena P. Blakely, R.N. F.R.C.P. 26 Initial Disclosure
    a) Government Tort Claim
    b) Incident-Investigation Report

*Scalia v Kern, et al.*

      c) Kern County Correctional Facilities Medical Records
      d) Kern Medical Center Records
24. Plaintiff's Initial Disclosures under Rule 26(a)(1) of the Federal Rules of Civil Procedure
25. Google search on Librium and Klonopin
26. Records from Kern County Sheriff's Office Records Keeper:
    a) 2151361 Scelia (class) CJIS
    b) 2151361 Scelia (med) records
    c) Scelia B-pod Floor Day Shift 6.22.16-7.1.16
    d) Scelia B-pod Floor and Control 7.1.16
    b. e)    Scelia   B Control   Day shift   6.22.16 - 7.1.16
    c. f)    Scelia   Infirmary   Day shift   6.22.16. - 7.1.16
    d. g)    Scelia   Infirmary   Night shift   6.22.16 - 7.1.16
    e. h)    Scelia   Master control night shift   6.22.16 - 7.1.16
    f. i)    Scelia   Receiving Night shift   6.22.16 - 7.1.16
    g. j)    Scelia   Receiving control Night shift   6.22.16 - 7.1.16
    h. k)    Scelia   Receiving control Day shift   6.22.16 - 7.1.16
    i. l)    Scelia   Sgt. office Night shift   6.22.16 - 7.1.16
    j. m)    Scelia   Sgt. office Day shift   6.22.16 - 7.1.16
    k. n)    Scelia   Master control Day shift   6.22.16 - 7.1.16
    l. o)    Scelia   Receiving Day shift   6.22.16 - 7.1.16
    m. p)    Scelia CJIS
    n. q)    Scelia memo and iLeads
27. Transcript of 12.21.2018 Deposition of John Scalia with exhibits A-G
28. Video of Deputy Randi Allen Deposition
29. Draft Deposition Rowena Blakely taken 3/18/19
30. Medical Records of Dr. Toney Carey from Ronsin Litigation Support Services;
31. Mary K. Shell Mental Health Center Records for Ms. Scalia;
32. California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities;
33. The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails (2014 Edition);
34. Scope and Standards of Practice for Correctional Nursing (2nd Edition);

*Scalia v Kern, et al.*

### III. SUMMARY OF DOCUMENT REVIEW

| Time | Provider/Service | Comments |
|---|---|---|
| **Tuesday, June 21, 2016** | | |
| @ 1701 | Arrest Report | Ms. Kim Scalia was arrested by the Kern County Sheriff's Department and booked into the Taft Jail. It was noted in the arrest report that Ms. Scalia appeared to be intoxicated. |
| **Wednesday, June 22, 2016** | | |
| @ 1254 | Booking Medical Data | Kim Scalia (spelled Scelia) was medically questioned at booking into the Kern County Jail. All screening questions were marked with a "No" response. |
| @ 1255 | Inmate Movement Log | Ms. Scalia was moved to the Central Receiving Facility |
| @ 1232 | Medical Screening Nevarez **EXH 100-11** **EXH 100-6/7/8** | Kim Scalia (spelled Scelia) was medically screened at booking by the registered nurse. Blood pressure 167/92, pulse of 84, respirations of 18, and temperature of 98.7. She was noted to be alert and oriented and denied being suicidal. She reported anxiety and depression and taking Xanax and Lexapro. She denied respiratory, cardiovascular, neuromuscular, GI/GU, endocrine or integumentary system issues. She reported daily use of alcohol. The nurse noted that she was familiar with this patient's history. Ms. Scalia denied ever being suicidal but was placed on suicide watch due to known attempts in the past. The nurse was unsure how long ago. She notified the deputy and made a psych referral. She was referred to nursing sick call the following day and MD sick call as needed. The nurse noted that the patient was placed on Librium for the ETOH protocol for a history of daily drinking. She was noted to be alert and oriented with a flushed appearance. |
| @ 1250 | Physician's Order **EXH 100-1** | Orders written for ETOH Withdrawal<br>Librium 50 mg TID x 2 days, then<br>Librium 25 mg TID x 4 days<br>Multivitamins daily x 6 days<br>Thiamine 100 mg daily x 6 days |
| @ 1300 | Progress Note **EXH 100-6** | Placed on suicide watch due to known history of suicide ideation. The patient denied suicide or any history at that time of suicide attempts. |
| @ 1300 | Incident Narrative Deputy Bacon Deputy Brown | Nurse Nevarez informed the deputy that Ms. Scalia was going to be placed on suicide watch as she had taken prescription medication to harm her and also drank in excess. Ms. Scalia also told the deputy that she drank very heavily yesterday and that she had a major alcohol problem. |
| @ 2131 | Suicide Watch Note Rowena Blakely, RN **EXH 100-7/8** | It was noted that Ms. Scalia was alert and oriented x 3 and denied thoughts of self-harm. No vital signs were taken. The patient was noted to be tearful and in no acute distress. Pupils |

| | | |
|---|---|---|
| | | were equal, skin color and turgor were good with no tremors noted. |
| | **Thursday, June 23, 2016** | |
| @ 0200 | MAR | Librium 50 mg given |
| @ 0315 | Pregnancy Test<br>**EXH 100-6** | Negative |
| @ 0800 | MAR | Librium 50 mg not given |
| @ 0900 | Out to Court<br>**EXH 100-6** | Reschedule for suicide watch check due to court appearance. |
| @ 1624 | Correctional Mental Health Screening<br>Lorre Ann Webb | The Mental Health Professional saw Ms. Scalia who denied current and prior suicidal behavior. She reported current medications of Xanax and Lexapro, and currently being treated for hypothyroidism. QMHP Webb recommended stress reduction-relaxation exercises, and crisis intervention counseling. She informed Ms. Scalia how to request additional services and scheduled her for medication follow-up. Verbal medication orders were received from Dr. Barreras and given to medical. |
| @ 2000 | Suicide Watch Note<br>**EXH 100-7/8** | It was noted that Ms. Scalia was on suicide watch, easily aroused. She was oriented x 3, coherent and denied suicidal ideation. No vital signs were taken. The patient slept most of the night. |
| @ 2000 | MAR | Klonopin 0.5 mg given<br>Librium 50 mg given<br>Thiamine 100 mg given<br>Multivitamin 1 tab given |
| | **Friday, June 24, 2016** | |
| @ 0200 | MAR | Librium 50 mg given |
| @ 0800 | MAR | Celexa 40 mg given<br>Librium 50 mg given |
| @ 1045 | Suicide Watch Note<br>**EXH 100-9/10** | It was noted that Ms. Scalia was on suicide watch, alert and oriented x 3, and denied suicidal intent. It was noted that vital signs were unable to be obtained. Skin color was good, tremors absent and gait steady. It was noted that Ms. Scalia's color had improved since admission and wanted to get out of suicide watch. |
| @ 1120 | Supplemental Incident Report<br>Deputy Meacham | Correctional Mental Health Therapist Loree spoke with Ms. Scalia and determined they could discontinue suicide watch. She was rehoused in cell C3-4. |
| @ 1420 | Individual Progress Note<br>Loree Webb | The Mental Health Professional saw Ms. Scalia who reported a decades long history of (redacted) and reports liver damage as a result of (redacted). Ms. Scalia reported that she had been overwhelmed for some time and the events around her arrest were due to lashing out while (redacted). She repeatedly stated that she needed some help. Ms. Scalia reported that she was unable to return to her house she shared with her husband and |

*Scalia v Kern, et al.*

| | | |
|---|---|---|
| | | the victim of her crime and was unable to state where she will live upon her release and may have to return to LA and live with friends/family. Suicide watch was discontinued with follow up. |
| @ 2000 | MAR | Klonopin 0.5 mg given<br>Librium 50 mg given<br>Thiamine 100 mg given<br>Multivitamin 1 tab given |
| **Saturday, June 25, 2016** | | |
| @ 0200 | MAR | Librium 25 mg given |
| | | No notations that Ms. Scalia was monitored for ETOH Withdrawal during this date. |
| @ 0800 | MAR | Celexa 40 mg given<br>Librium 25 mg given |
| @ 2000 | MAR | Klonopin 0.5 mg given<br>Librium 25 mg given<br>Thiamine 100 mg given<br>Multivitamin 1 tab given |
| **Sunday, June 26, 2016** | | |
| @ 0200 | MAR | Librium 25 mg given |
| | | No notations that Ms. Scalia was monitored for ETOH Withdrawal during this date. |
| @ 0800 | MAR | Celexa 40 mg given<br>Librium 25 mg given |
| @ 2000 | MAR | Klonopin 0.5 mg given<br>Librium 25 mg given<br>Thiamine 100 mg given<br>Multivitamin 1 tab given |
| **Monday, June 27, 2016** | | |
| @ 0200 | MAR | Librium 25 mg given |
| @ 0800 | MAR | Celexa 40 mg given<br>Librium 25 mg given |
| | Progress Note<br>J. Sandison, LVN<br>**EXH 100-5** | Inmate Scalia taken off suicide watch by psych department Transfer to Pre-Trial from CRF. |
| | | No notations that Ms. Scalia was monitored for ETOH Withdrawal during this date. |
| @ 1948 | Inmate Movement Log | Ms. Scalia was moved to B605 |
| | Interview of Felicia Thornton – cellmate in B605 | Inmate Thornton reported that when Ms. Scalia came into the cell she asked if she could have the lower bunk. Inmate Thornton would not switch as she had arthritis in her knees and could not climb to the top. |
| @ 2000 | MAR | Klonopin 0.5 mg given<br>Librium 25 mg given<br>Thiamine 100 mg given<br>Multivitamin 1 tab given |

*Scalia v Kern, et al.*

| | | |
|---|---|---|
| | Interview of Felicia Thornton – cellmate in B605 | Inmate Thornton reported in her interview that Ms. Scalia was moving around too much and all of the sudden she came flying out of bed. She came down and her head hit the ground first, then her legs and back hit second. She described her as "tripping in her mind or something awful". Inmate Thornton told Ms. Scalia to push the button and tell the officer. |
| @ 2315 | KSCO B Control Log | A notation was made that Ms. Scalia fell off her bunk. |
| | Deposition of Deputy Randi Allen | Deputy Allen testified that she was called by Deputy Miller and told to check on Ms. Scalia in cell 605. When she arrived, Ms. Scalia was standing near the door and claimed that she had fallen and hit her head. The deputy opened the door and testified that Ms. Scalia was alert, talking, and didn't seem at all concerned about her head, but kept repeating that she wanted a room change and needed a bottom bunk. The deputy asked Ms. Scalia if she could walk and she said yes. They walked toward the infirmary and down the staircase, Ms. Scalia was walking slow and by the time they got to the door, she said that she could not walk anymore. The deputy testified that she got Ms. Scalia a wheelchair from the infirmary and came back to get her. The deputy testified that she came back and took Ms. Scalia to the infirmary to see a nurse and explained to the nurse that she had fallen off the bunk and hit her head. |
| @ 2325 | Progress Note Rowena Blakely, RN | Nurse Blakey noted in the medical record that Ms. Scalia was brought to the infirmary by Deputy Allen per wheelchair from CRF with Rx.<br>**S**: Claims she fell hit her left side of face, left elbow and left knee.<br>**O**: Blood pressure 111/72, pulse 65, respirations 18, temperature 98.5. Noted small abrasion to left knee with no active bleeding. Patient requesting for her meds.<br>**A**: as above<br>**P**: HS meds given. Lower bunk lower tier. MDSC 6/30/16 to follow up fall. |
| | Deposition of Deputy Randi Allen | Deputy Allen testified that Ms. Scalia was in the wheelchair during this assessment with nurse Blakely. |
| @ 2319<br>@ 2335 | Inmate Movement Log | Ms. Scalia was rehoused to cell B310. She was taken there via wheelchair by deputy Allen. |
| **Tuesday, June 28 2016** | | |
| | Interview of Veronica Navarette – cellmate in B310 | Inmate Navarette reported in her interview that they went to sleep after Ms. Scalia came to the cell and she was awakened and heard Ms. Scalia throwing up while standing up. She went back to sleep and then woke up again and saw her on the floor. She rolled her over and saw that she was blue. She called the deputy on the intercom. |
| @ 0224 | Deposition of Deputy Randi Allen | Deputy Allen was called by Deputy Miller and informed that Ms. Scalia needed to be checked because one of the inmates had hit the intercom button. When she arrived, she found Ms. Scalia |

*Scalia v Kern, et al.*

| | | |
|---|---|---|
| | | on the ground near the toilet. She was unconscious with vomit near her. She testified that Ms. Scalia was mumbling and pale. She said that she looked "bad". She called for a medical priority and a nurse and deputy responded with a gurney. The nurse requested that Ms. Scalia be transported to the infirmary and she was picked up and placed on the gurney. Deputy Allen testified that she informed the nurse that she found Ms. Scalia unconscious on the floor. |
| @ 0230 | Progress Note Rowena Blakely, RN | RN Blakely noted in the medical record that she was called for medical priority in B-pod and found inmate lying on the floor breathing evenly. She was lethargic and was assisted up to gurney. Coffee-ground emesis was on the towel in a small amount. She was wheeled to the infirmary. Blood pressure was 163/84, pulse of 58, respirations of 18 and oxygen saturation of 96% on room air. She was responsive verbally, pupils equal and reactive to light. FSBS 113. Small bump to eyebrow from the first fall noted. Will send to ER via ambulance. |
| @ 0230 | ER Paperwork **EXH 100-2** | RN Blakely filled out a form to send to the ER with Ms. Scalia indicating that the patient fell in the pod 2 x tonight. Lethargic but responsive verbally. BP 163/84, P 58, R 18, Oxygen saturation 96% on RA. Vomited small amount of coffee ground emesis with history of ETOH abuse on Librium 25 mg TID last dose at 2325 hours. Klonopin 0.5 mg at HS, Strattera 20 mg (a medication Ms. Scalia was not taking) in the AM with small bump to the left eyebrow from the first fall. Pupils equal reactive to light. To KM ER. |
| @ 0237 | Hall Ambulance Records | Call Received |
| @ 0238 | | Dispatched |
| @ 0241 | | En Route |
| @ 0253 | | At Scene |
| @ 0253 | | At Patient – Lerdo Nurse (Blakely) stated that the patient was slow to respond and vomited coffee brown emesis. The nurse told paramedics that the inmate was brought in tonight for possible ETOH. Upon arrival patient noted to have vomited brown emesis, good ROM and sensation to all extremities, but slow to respond. |
| @ 0315 | | Transport – Loaded and transported to KMC, with patient confused, stating she is resting with the animals. She continued to talk and not make sense. |
| @ 0334 | | At Destination (Hospital) |
| | Kern Medical Center | Ms. Scalia was taken to Kern Medical Center for evaluation. A CT Scan of the head was done and showed a large acute left hemispheric subdural hematoma with significant mass effect and herniation to the right, and likely early changes of trans tentorial herniation with mild mass effect on the brainstem. |

| | | |
|---|---|---|
| | | Ms. Scalia was taken to the OR for an emergent craniotomy with evacuation of the subdural hematoma, but never regained consciousness. The patient's poor prognosis was discussed with the family on 6/30/16 and they decided to proceed with comfort measures. |
| **Friday, July 1, 2016** | | |
| @ 0005 | Kern Medical Center | Ms. Scalia was pronounced dead. Cause of death was noted as "Blunt Injury to Head" Other conditions contributing to death: Laennec's cirrhosis, end-state; hypertrophic heart disease. |

### IV. DISCUSSION AND OPINION

Based on my review of the documents provided, my education, training, 33 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that the care provided to Ms. Kimberly Scalia by healthcare personnel from the Kern County Hospital Authority while incarcerated in the Kern County Jail did not meet the standard of care in accordance with standard practice in correctional facilities in the State of California and totally ignored the risk caused by her head injury and the potential for serious health concerns. The training provided to Nurse Blakely, who was left as the gatekeeper to a higher level of care was so deficient that Ms. Scalia was not provided with a constitutional level of care to meet her serious medical needs.

**California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities, § 1213. Detoxification Treatment** states that the responsible physician shall develop written medical policies on detoxification which shall include a statement as to whether detoxification will be provided within the facility or require transfer to a licensed medical facility. The facility detoxification protocol shall include procedures and symptoms necessitating immediate transfer to a hospital or other medical facility.

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-G-07 – "Intoxication and Withdrawal"** states that protocols exist for managing inmates under the influence of alcohol or other drugs and those undergoing withdrawal from alcohol, sedatives, or opioids. It further requires that established protocols are followed for the assessment, monitoring, and management of individuals manifesting symptoms of alcohol and drug intoxication and withdrawal. The protocols for intoxication and detoxification are approved by the responsible physician, are current, and are consistent with nationally accepted treatment guidelines.

It is clear from the review of the documents provided that the healthcare staff at the Kern County Jail were well aware of Ms. Scalia's alcohol history at the time of her booking. Ms. Scalia admitted to heavy drinking and was noted to intoxicated at the time of her arrest. She also reported a decades long history of liver damage.

No protocols were included for review but based on the Kern County Jail health record for Ms. Scalia, she was not monitored in a manner that is consistent with nationally accepted treatment guidelines. At a minimum, the management of patients undergoing the potential for alcohol

withdrawal syndrome should be monitored for signs of elevated blood pressure, tachycardia, elevated body temperature, sweating, tremulousness of body/increased hand tremor, dilated pupils, and disorientation, and symptoms of anxiety, insomnia, illusions, hallucinations, paranoid ideas, nausea and irritability. Either the protocols are not consistent with national guidelines, or the nursing staff were not trained and failed to follow an appropriate protocol that would include close monitoring during the withdrawal period.

Although Ms. Scalia was started on appropriate medications for the management of alcohol withdrawal (Librium, Thiamine, and Multivitamins), there was no monitoring to ensure that she was not experiencing the above signs and symptoms. During her stay in suicide watch she was monitored once daily for suicidal intent, but no vital signs were ever obtained to assess the effectiveness of the medication treatment for alcohol withdrawal. After she was cleared from suicide watch on **Friday, June 24, 2016** she was not monitored at all to ensure if she was experiencing any of the above signs and symptoms. At no time during her incarceration was Ms. Scalia referred to and/or seen by a medical provider.

The Medication Administration Record (MAR) shows that Ms. Scalia was started on Klonopin and Celexa on June 23rd and 24th respectively by the mental health provider. It is important to note that Librium and Klonopin both increase sedation and drowsiness, especially when combined.

On the evening of **Monday, June 27, 2016** Ms. Scalia was transferred to Pre-Trial Cell B605 and placed into a cell with only an open top bunk. Although she asked her roommate to change places, she would not agree, and Ms. Scalia had to climb to an upper bunk to sleep. It is not clear how Ms. Scalia fell from the top bunk, which was 4.5 feet from the ground, but any patient being treated for alcohol withdrawal and taking medications that cause sedation and drowsiness should be housed in an area where a potential fall is minimized; either a bottom bunk or a mattress on the floor. The decision to place this inmate in an area where she was forced to climb into a top bunk was reckless and indifferent to her serious medical need.

**California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities, § 1204. Health Care Staff Procedure** states that medical care performed by personnel other than a physician shall be performed pursuant to written protocol or order of the responsible physician.

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-11 – "Nursing Assessment Protocols"** states that Nursing Assessment Protocols are appropriate to the level of competency and preparation of the nursing personnel who will carry them out and comply with the relevant state practice acts. The standard further states that documentation of the nurses' training in protocol use exists and includes evidence that all nursing staff are trained, demonstrate knowledge and competence, review the protocols annually for competency, and are retrained when protocols are introduced or revised.

**Correctional Nursing: Scope and Standards of Practice, 2nd Edition, Standard 1. Assessment**, states that the correctional registered nurse collects comprehensive data pertinent to the patient's health and/or the situation and prioritizes data collection based on the patient's immediate condition, or the anticipated needs of the patient or situation.

*Scalia v Kern, et al.*

After Ms. Scalia fell from her bunk she called for help and reported that she had hit her head, arm, and knee. A deputy (Allen) responded to her cell and escorted her to see the nurse for evaluation. On route to the medical clinic, Ms. Scalia was unable to continue unaided and had to be taken by wheelchair to see the nurse. As Deputy Allen testified in deposition, the nurse evaluated Ms. Scalia while she was sitting in the wheelchair. Nurse Blakely testified in deposition and confirmed that she never had Ms. Scalia stand and/or ambulate during this assessment.

An appropriate assessment for any patient who has sustained a head injury from a fall would include:

- Full vital signs
- Mental status evaluation
- Neurological observations including pupil response to light, limb movement and limb strength and balance.
- A description of injuries
- A description of the fall
- History of loss of consciousness

Nurse Rowena Blakely's assessment of this patient was so cursory and unfocused that it constituted no assessment at all. She never asked her patient to get up from the wheelchair to assess her balance and/or gait. She made no neuro assessment, she did not evaluate the patient's mental status, and she did not question her regarding how she fell and if she sustained any period of unconsciousness. Nurse Blakely knew this patient was on the Alcohol Withdrawal Protocol and taking medications that caused sedation and drowsiness, and she should have known that alcoholic patients are at high risk for bleeding after trauma due to the coagulopathy that accompanies cirrhosis. Alcohol contributes substantially to the morbidity and mortality of trauma patients, regardless of the type of injury suffered.

Based on this patient's history, at a minimum, Nurse Blakely should have made a thorough assessment of this patient, including a neurological evaluation and called the ER provider for direction. Incredibly, Nurse Blakely testified in deposition that as a curtesy, the nurses don't call the on-call provider after 9 pm but they can call the ER physician, which she did not do. An emergency room evaluation and CT Scan would have shown a subdural hematoma and early intervention could have been provided. Even minimally, Nurse Blakely had the option to keep Ms. Scalia in the Infirmary where she could have monitored her condition closely. Instead, Nurse Blakely sent Ms. Scalia back to an unmonitored cell, with a physician follow-up in two days. Much too late for Ms. Scalia.

The care provided by Nurse Blakely did not meet the standard of care in accordance with standard practice in correctional facilities in the State of California and totally ignored the risk caused by her head injury and the potential for serious health concerns.

It is difficult to determine if Nurse Blakely had been trained in any treatment protocols, as they were not included with the discovery documentation. However, the personnel file reviewed for Nurse Blakely did not contain any evidence that she had been trained in the use of protocols or

*Scalia v Kern, et al.*

assessed for her competence in this critical nursing skill at any time after 2012, as required by the standards. Nurse Blakely testified that the two hours of training she receives annually consist of use of the glucometer, HIPAA, PREA, OSHA and how to draw blood, codes yellow, black, grey and red at this hospital, and fire safety, but nothing regarding patient assessment and treatment in the event of head injury. Failing to train nursing personnel in assessment and treatment skills who are assigned as the gatekeepers to a higher level of care is reckless and indifferent to the needs of this patient population.

Nurse Blakely testified in deposition that she had never received training in assessment of a patient with a head injury and/or patient with chronic alcoholism and her actions in this case demonstrate her lack of skill in these areas. She also testified that she never received any specific training on the protocols that are kept in the binder. It is egregious for a correctional health care system to place nursing personnel as gatekeepers to care who are not equipped to properly evaluate patients such as Ms. Scalia.

**California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities, § 1208. Access to Treatment** states that the health authority, in cooperation with the facility administrator, shall develop a written plan for identifying and/or referring any inmate who appears to be in need of medical, mental health or developmental disability treatment at any time during his/her incarceration subsequent to the receiving screening. Assessment and treatment shall be performed by either licensed health personnel or by persons operating under the authority and/or direction of licensed health personnel.

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-A-01** – **"Access to Care"** states that inmates have access to care to meet their serious medical, dental, and mental health needs.

Nurse Blakely was the gatekeeper to provide access to a higher level of care for Ms. Scalia. Ms. Scalia was dependent on the system to work and for this nurse to provide assessment and referral for her serious medical need. Both the system and Nurse Blakely failed this patient.

**California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities § 1206. Health Care Procedures Manual** state that the health authority shall, in cooperation with the facility administrator, set forth in writing, policies and procedures in conformance with applicable state and federal law, which are reviewed and updated at least every two years and include but are not limited to:
  (a) summoning and application of proper medical aid;
  (b) contact and consultation with private physicians;
  (c) emergency and non-emergency medical and dental services, including transportation;
  (d) provision for medically required dental and medical prostheses and eyeglasses;
  (e) notification of next of kin or legal guardian in case of serious illness which may result in death;
  (f) provision for screening and care of pregnant and lactating women, including prenatal and postpartum information and health care, including but not limited to access to necessary vitamins as recommended by a doctor, information pertaining to childbirth education and infant care, and other services mandated by statute;
  (g) screening, referral and care of mentally disordered and developmentally disabled inmates;
  (h) implementation of special medical programs;
  (i) management of inmates suspected of or confirmed to have communicable diseases;

  (j) the procurement, storage, repackaging, labeling, dispensing, administration/delivery to inmates, and disposal of pharmaceuticals;
  (k) use of non-physician personnel in providing medical care;
  (l) provision of medical diets;
  (m) patient confidentiality and its exceptions;
  (n) the transfer of pertinent individualized health care information, or individual documentation that no health care information is available, to the health authority of another correctional system, medical facility, or mental health facility at the time each inmate is transferred and prior notification pursuant to Health and Safety Code Sections 121361 and 121362 for inmates with known or suspected active tuberculosis disease. Procedures for notification to the transferring health care staff shall allow sufficient time to prepare the summary. The summary information shall identify the sending facility and be in a consistent format that includes the need for follow-up care, diagnostic tests performed, medications prescribed, pending appointments, significant health problems, and other information that is necessary to provide for continuity of health care. Necessary inmate medication and health care information shall be provided to the transporting staff, together with precautions necessary to protect staff and inmate passengers from disease transmission during transport.
  (o) forensic medical services, including drawing of blood alcohol samples, body cavity searches, and other functions for the purpose of prosecution shall not be performed by medical personnel responsible for providing ongoing care to the inmates.

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-06– "Emergency Services"** states the facility provides 24-hour emergency medical, dental, and mental health services.

When Ms. Scalia was found unresponsive in her cell approximately 3 hours after she fell from the top bunk and was "cleared" by Nurse Blakely, a medical emergency was called. Deputies and Nurse Blakely responded to the cell and had her transferred to the medical clinic by gurney for evaluation. EMS was called and responded to the facility half an hour later. When Nurse Blakely prepared the emergency room paperwork, she failed to accurately provide a full history for this patient. The following inaccuracies noted in the record include:

- Nurse Blakely reported that Ms. Scalia had fallen twice that night, although there is no evidence that she fell more than once at **2315 hours**.
- Nurse Blakely failed to report in writing to the hospital, or verbally to the EMS crew that Ms. Scalia had fallen at **2315 hours** from a top bunk landing on her head.
- The list of medications that Ms. Scalia was taking included a medication she was not taking (Strattera which is given to patient with ADAD) and excluded medications she was taking (Celexa (which is an antidepressant), Thiamine and MVI).

It is critical that emergency responders and the treating emergency room are given an accurate history when a patient is sent for emergent care. Typically, a correctional nurse would be required to call the ED to report that a critical patient was on the way and give a full verbal report. Instead Nurse Blakely sent inaccurate and partial information with this patient.

**Summary of Opinions**

1. There were barriers to accessing healthcare in the Kern County Jail created by Rowena

*Scalia v Kern, et al.*

    Blakely when she failed to properly assess and refer Ms. Scalia after a fall from an upper bunk that injured her head.

2. The management and monitoring of inmates going through withdrawal from alcohol in the Kern County jail falls below the standard of care and is indifferent to serious medical need.

3. There is no evidence that the Kern County and Kern County Hospital Authority (KCHA) trained Nurse Blakely on how to utilize nursing assessment protocols and ensure that she was competent in their use since 2012 as required by the standard. She testified that she had not been trained in the assessment and treatment of patients with head injury and/or chronic alcoholism. This is well below the standard of care in the correctional setting and indifferent to this patient population.

4. Based upon the testimony of Nurse Blakely (and subject to review) the policies in place governing nursing care in these circumstances appear to be inadequate and led to the final outcome.

5. The emergency care and referral information provided to EMS and the hospital emergency room was inaccurate and lacked sufficient detail of the events leading up to Ms. Scalia's transfer.

6. Based on my education and experience in the correctional health care setting, and review of the records, it is my opinion that the care provided to Ms. Kimberly Scalia by healthcare personnel from the Kern County Hospital Authority while incarcerated in the Kern County did not meet the standard of care in accordance with standard practice in correctional facilities in the State of California and totally ignored the risk caused by her head injury and the potential for serious health concerns.

My opinions in this case are based on many years of education and experience in the correctional health field, and upon the documentation provided to me for review. I reserve the right to change this opinion in the event additional documentation is provided in this matter. My opinions herein are expressed within a reasonable degree of nursing certainty.

Executed on March 18, 2019 in Reno, Nevada.

*KathWild*

_____
    Kathryn J. Wild, RN, MPA, CCHP-RN