1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3

4    JOHN SCALIA, individually       )

5    and as successor-in-interest    )

6    of Decedent KIMBERLY            )

7    MORRISSEY-SCALIA,               )

8              Plaintiff,            )

9         -vs-                       ) Case No.

10   COUNTY OF KERN, a municipal     ) 1:17 CV 01097 LJO SKO

11   corporation, et al.,            )

12             Defendants.           )

13   _____

14

15

16        DEPOSITION OF KATHRYN JEAN WILD, R.N.

17             Tuesday, May 14, 2019

18                Reno, Nevada

19

20

21   Reported by:   Karen Bryson

22              Certified Court Reporter #120

23   JOB No. 3307497

24

25   PAGES 1 - 152

                                        Page 1

1:17-CV-01097-LJO-JLT          EXH 1013-1

1  assessing this patient at 11:15 in the evening who had

2  just fallen off a top bunk, my first suspicion would be

3  she had a seizure.  And -- and that needs to be

4  considered.

5        So it wasn't -- I guess my criticism at that

6  point in time is Nurse Blakely didn't even consider that

7  this was alcohol withdrawal related.

8        Q    I guess my question wasn't clear.  Let me re --

9  back up then.

10        Was there any indi -- other than the fact that

11  she fell, do you have any indication anywhere in the

12  medical records that Kim Scalia suffered a seizure at any

13  time after she was booked?

14        A    No.

15        Q    Other than the fact of the fall on the night of

16  the 27th, do you have any facts to suggest that that fall

17  was because of a seizure?

18        A    Not from the record.  But Nurse Blakely

19  didn't -- she didn't even consider that an al -- a patient

20  going through alcohol withdrawal, falling off a top bunk

21  very likely could have been the result of a seizure.

22        Q    Okay.  Even if she did consider it, what

23  difference would that have made?

24        A    If she had picked up the phone and called 911

25  or she would have called the provider at least to get

Page 61

```
 1   direction --

 2        Q    No.  I guess my question wasn't clear.

 3            If it had gone through her mind, well, one

 4   possibility is she had a seizure -- although it's highly

 5   unlikely because for the past week she's had zero

 6   seizures -- what difference would that have made in the

 7   care provided in this case?

 8            MR. SCHMIDT:  Objection; argumentative,

 9   incomplete hypothetical, assumes facts not in evidence.

10            THE WITNESS:  Well, I wouldn't agree that it's

11   highly unlikely.  You have a patient going through --

12   she's still on treatment protocols for alcohol withdrawal.

13   She is still potentially -- has the potential to seize at

14   this point.  This woman is a long-time chronic alcoholic.

15            It is not unusual during that first week period

16   of time where you have alcoholics going through withdrawal

17   for them to seize on -- to seize on day seven.  It's --

18   it's not unlikely at all.

19            It should have been considered.  And if it

20   would have been considered, then it would have required

21   Nurse Blakely to pick up the phone and call a provider or

22   send her to the hospital.  Because that's what their

23   protocol says, if -- if the patient has escalating

24   symptoms of withdrawal --

25   ///
```

Veritext Legal Solutions
866 299-5127

1:17-CV-01097-LJO-JLT                    **EXH 1013-3**

BY MR. SPACKMAN:

    Q    Right.  If they have actual seizures or symptoms of withdrawal, then you got to call in for further help.

    A    Yeah.  You have a lady thrashing around on her top bunk, jump -- you know, hopping out of the bunk.  The most likely scenario for that is she had a seizure.

    Q    Do you believe -- is it your opinion that more likely than not that the cause of Kim Scalia's fall is because she had an alcohol withdrawal seizure?

    A    It should have been considered.

    Q    That's not my question.  I get that it's on the list of possibilities in the universe.  That's not my question right now.

    My question is:  Are you saying more likely than not that was the cause of her fall?

    MR. SCHMIDT:  Objection; incomplete hypothetical.

BY MR. SPACKMAN:

    Q    Or would that call for some type of speculation?

    A    I am not -- I'm not saying more likely than not but I'm saying it -- based on this woman's history, chronic alcoholism, she's on the withdrawal protocol, you know, she's -- she's just brought in because she's fallen

Page 63

1:17-CV-01097-LJO-JLT                    EXH 1013-4

```
 1   off the top bunk.

 2              I mean, it had to have been considered.  And if

 3   it would have been considered -- even if she didn't know

 4   for sure -- she should have called the doctor.

 5        Q    So that's what I'm trying to get at, is --

 6   is it -- you're saying that the interpretation of the

 7   protocol, the way it should be interpreted is, any level

 8   of consideration, regardless of how low it is on the

 9   differential, mandates a call to a doctor?

10              MR. SCHMIDT:  Objection; vague and ambiguous.

11   BY MR. SPACKMAN:

12        Q    You're not saying that, are you?

13        A    I'm not sure what you're asking me, but --

14        Q    I'll -- I'll --

15        A    -- in consideration of --

16        Q    -- rephrase it then.

17        A    -- what --

18        Q    I'll rephrase it.

19        A    Yeah.

20        Q    You're saying it can be considered had you

21   called.  So you -- you understand how differentials work,

22   right?

23        A    Sure.  It should have been high on her

24   differential.

25        Q    That -- so that's what I'm asking you here.
```

Page 64

1    or, is it anyone's responsibility to ensure she's on a

2    bottom bunk or -- strike that.

3           Is it?

4      A    Yes.  It's the system's responsibility.  The

5    communication between health care and custody to alert

6    staff that this patient needs an accommodation, whether

7    it's a bottom bunk, whether it's, you know, an extra

8    mattress, whether it's special shoes, nurses -- nurses

9    communicate that need to the custody side, and then -- and

10   then that responsibility is on the custody side.

11     Q    And you're not sure -- in this case was there

12   any discovery you're aware of about what that

13   communication was --

14     A    No.

15     Q    -- between the nursing and the custody people?

16     A    I couldn't find -- I couldn't -- generally

17   there'd be a copy in the medical chart or in the -- in the

18   order sheet that the patient's been given a bottom bunk,

19   bottom tier, authorization?

20          I didn't see any of that.  But I did see that

21   in the -- in the alcohol withdrawal protocol, that's one

22   of the -- that's one of the plan.  That's one of the

23   treatment plans.

24     Q    Was she still on the alcohol withdrawal

25   protocol when she got transferred over to Lerdo?

Veritext Legal Solutions
866 299-5127

1:17-CV-01097-LJO-JLT

EXH 1013-6

1   A    She was still on the meds for alcohol

2   withdrawal, yes.  So she was still on the protocol.  It

3   was a seven-day treatment.

4       Q    Okay.  And when was she first booked in?

5       A    The 22nd?  Twenty-third?  Twenty-first?

6   Twenty-one.

7            Well, no.  She was booked into the jail on the

8   22nd at 12:54 in the afternoon.  And then it was five days

9   later she had her event.

10      Q    So is it your testimony that she had not been

11  taken off the alcohol withdrawal protocol as of the night

12  of the 27th?

13      A    Correct.

14      Q    And the way you know that is it's a seven-day

15  program.  And she's still on the medication for the

16  Librium.  Right?

17      A    Correct.

18      Q    Okay.  Anyway, going back to the -- and I

19  haven't explored with you your criticisms of Nurse Blakely

20  and what you think she should have done differently in the

21  case, and I'm going to give you that chance -- but I just

22  want to finish up the alcohol withdrawal section of this.

23           Even if the alcohol withdrawal protocol had

24  been followed with regards to monitoring the patient, as

25  you say, it should have been done --

                                              Page 72

```
 1         A    Well, again, there was no monitoring piece in

 2    the protocol.

 3         Q    Right.

 4         A    Yeah.

 5         Q    I'm trying to accurately describe what you have

 6    said should have been done differently.

 7              The protocol should have included vital signs

 8    and how to do the monitoring?

 9         A    Right.

10         Q    Indeed, then the nurses should have been doing

11    the monitoring that way and been recording it --

12         A    Right.

13         Q    -- correct?

14              Even if all of that had occurred the way you

15    believe it should have, you know, during all those days

16    before the patient was transferred over to Lerdo, can you

17    describe how or if that would have changed the ultimate

18    outcome in this case?

19         A    Well --

20              MR. SCHMIDT:  Objection; incomplete

21    hypothetical, vague and ambiguous.

22              You can answer if you're able to.

23              THE WITNESS:  She wouldn't have fallen off of a

24    top bunk on her head.

25    ///
```

Page 73

```
1    questions about what's going on with you.

2    BY MR. SPACKMAN:

3        Q    Did the protocol at Orange County Correctional

4    Health Services for abdominal pain specify the specific

5    questions the nurse is supposed to ask?

6        A    I can't speak to the Orange County one, I don't

7    recall.

8        Q    How about San Bernardino?

9        A    I mean, specifically I'd have to look at the

10   protocol.  But it should have.

11       Q    There's a certain amount of, you know, nursing

12   knowledge that you're allowed to assume the nurses have

13   without having to tell them how to ask every single

14   question, isn't there?

15            MR. SCHMIDT:  Objection; vague and ambiguous,

16   lack of foundation, incomplete hypothetical.

17            THE WITNESS:  Yes, but you also -- if you're

18   going to use nursing protocols for your nurses to deliver

19   care, you have to have a protocol that -- that spells it's

20   out.  Because generally without a protocol we're not

21   allowed to order Librium.  You know, we're not allowed to

22   order medications.  It's not within our wheelhouse.  It's

23   not within our scope.

24            And it's the protocol -- and the BRN actually

25   specifies -- if you go to the California BRN, the nursing
```

Veritext Legal Solutions
866 299-5127

1:17-CV-01097-LJO-JLT                    EXH 1013-9

```
 1    board, there is -- and I know this intimately because
 2    initially when I was in Orange County back in the late
 3    '80s and the early '90s, one of my jobs there was to
 4    create the nursing protocols because they hadn't had them
 5    before then.
 6             So I -- I researched with the nursing board the
 7    development of -- of standardized procedures, is what
 8    they're called, but it's required that all these steps are
 9    in the protocols.
10             I believe that it's within -- it's Title 16,
11    and the section number I think is 1494, or something.  I
12    could be off a little bit there.  But there's a
13    requirement by the BRN that all these steps are in there.
14        Q    For -- all these steps for abdominal pain?
15        A    For protocol.
16        Q    Okay.
17        A    So -- so it's required that in your protocol
18    the nurses collect certain information, subjective.
19    Certain objective information.  And then there's got to be
20    criteria in there for when to call the physician.
21             It's -- it's part of the requirement.  If
22    you're going to have your nurses use protocols, you got to
23    write them the way the BRN requires.
24             And -- and does the BRN say for abdominal pain
25    you have to ask X, Y, Z?  No.  What they require is that
```

Page 82

```
 1    you, the entity, the system, and your responsible

 2    physician, your medical director, and your nursing

 3    director, collaborate together and come up with protocols

 4    that meet the criteria from the BRN.

 5         Q    But do they have to list every single question

 6    that the nurses are supposed to ask of the patient?

 7         A    Yeah.

 8         Q    They do?

 9         A    Yeah.  Every protocol I've seen written has a

10    subjective component, what we're here to ask the patient;

11    an objective component, what we're to collect; an

12    assessment, which is just your nursing diagnosis; but then

13    a plan.  A plan of action.

14         Q    How about patients with -- I'm trying to think

15    of things that would occur in the jail setting -- with

16    STDs?  Or -- is that something that you see from time to

17    time in the inmate population?

18         A    Yeah, but generally -- you know, when -- when

19    you're assessing for abdominal pain you've got to remember

20    this is -- this could be an acute problem.  And so it goes

21    through step-by-step.

22              STDs, I'm -- if you got one you probably think

23    it's acute, but it's probably not going to kill you, so --

24    but, yeah, there would be protocols on -- if you're having

25    your nurses do STD screening.  I mean, it's -- that's not
```

Page 83

1    conditions?

2        A    Yes.

3        Q    And would that protocol be required to list the

4    type of evaluation that the nurse is supposed to do?

5        A    Yes.  If they're following the directions of

6    the BRN in how to structure your standardized procedures,

7    your protocols.

8        Q    You've qualified your answers with if you're

9    following what the BRN says.

10            Is there a -- I get what the BRN says they want

11    to have happen.  Is that the standard of care in

12    correctional facilities to do everything the BRN says?

13        A    You bet.  Because --

14        Q    Okay.  No.  Yes --

15        A    Yeah.

16        Q    -- is fine.

17        A    Oh, my gosh.

18        Q    Okay.  Good.

19            And so at any time a facility is not following

20    the guidelines of the BRN, they are out of compliance?

21    Substandard?  In your opinion they're not doing what they

22    should?

23        A    If they are asking their nurses to deliver care

24    based on protocols or standardized procedures and they're

25    not adhering to the BRN?  Then they're looking for

Page 86

```
 1    trouble.  Yes.  They're working well outside the

 2    expected --

 3         Q    I understand.

 4         A    -- standard.

 5         Q    So this case involves a patient who ultimately

 6    is diagnosed with a subdural hematoma?

 7         A    Right.

 8         Q    I get what you're saying.  The facility

 9    wouldn't have a protocol on how to diagnose a subdural

10    hematoma?

11         A    No.

12         Q    Your -- with regards to protocols in this case,

13    I think your sole opinion that we read in the report was

14    with regards to the ETOH protocol.

15              I just want to make sure, are you going to be

16    coming into the trial of this case if it gets that far and

17    criticizing any protocol at Kern dealing with how to

18    assess Ms. Scalia for what -- the symptom she had on

19    June 27 at 11:25 p.m.?

20              MR. SCHMIDT:  Objection; compound question,

21    overbroad.

22    BY MR. SPACKMAN:

23         Q    Is there a protocol issue involved there?

24         A    Well, maybe lack of a protocol.

25         Q    That's what I'm saying.
```

Veritext Legal Solutions
866 299-5127

1:17-CV-01097-LJO-JLT                    EXH 1013-13

```
 1        A     I would expect to see a protocol on assessing

 2   patients with trauma.  Again, it's not going to be a

 3   diagnosis for subdural hematoma, but if you -- one of the

 4   things we see so often in the correctional facilities is

 5   patients who have suffered some trauma.

 6              They've either -- they've either slipped in the

 7   shower's a big one, you know, they've maybe been in a

 8   fight with a roommate, they've fallen off the top bunk.

 9   So nurses need to be able to assess that patient for, you

10   know, any kind of trauma they may have sustained and --

11   and provide appropriate treatment.

12              I didn't see -- I didn't see a protocol for

13   trauma.

14        Q     Okay.  When did you first review all the

15   policy -- the protocol and policies in this case?

16        A     They came after my initial report.  So sometime

17   between March 18th and April 14th?  Whatever day it was

18   that you sent over the protocols.  And I'm not sure I got

19   them all.  I'm not sure I got them all.  Because I think

20   initially a table of contents was sent and then specific

21   protocols were requested.

22        Q     Right.

23        A     Yeah.

24        Q     Well, I want to make sure I'm not surprised

25   here.
```

Page 88

```
 1    Blakely on or about September -- June 27 at 11:25, that's

 2    her first encounter?

 3         A     Right.

 4         Q     Could you summarize for me what you believe was

 5    done incorrectly by her?

 6         A     Yeah.

 7               First of all, she had a patient brought to her

 8    in a wheelchair with a report that she had fallen out of a

 9    top bunk and injured not only her head but her arm and her

10    knee.

11               Number one -- there isn't -- she should have

12    gotten a history from this patient.  You know.  Might have

13    been a basic question like, why did you fall off -- what

14    made you fall off the bunk?

15               Did you get tangled in your sheets?  Did you --

16    did you experience a seizure?  Were you -- were you drowsy

17    from the medications we've been giving you.  There should

18    have been some kind of investigation on her part of, you

19    know, why did you fall.

20               Number two, she was brought to her in a

21    wheelchair.  She should have -- she should have asked this

22    patient, you know, why did they have to bring you in a

23    wheelchair?  Does your knee hurt so bad that you can't

24    walk?

25               Or are you dizzy from hitting your head?  Or
```

Page 95

```
 1   what is the reason -- so she didn't even stand her up from

 2   the wheelchair to see if there were any mobility issues

 3   that were caused by the fall.

 4          All she documented in that first note was an

 5   abrasion to her knee that wasn't bleeding.  She didn't

 6   document the lump on her head which she later on

 7   attributed to the first fall.  So she must -- she must

 8   have seen that lump on her head but didn't document it in

 9   that first encounter.

10          Go through my -- so she didn't perform a neuro

11   exam.  Yes, she talked to the patient.  She questioned

12   her.  She did get vital signs, you know, but she didn't --

13   she didn't check the reactions of her pupils, which, you

14   know, in a patient with a head injury would be one of the

15   number one things that you would want to do.

16          She should have stood her up and assessed her

17   for, you know, equal strength on both sides.  Because

18   typically in a head injury one side of your head is

19   injured and then the other side -- you know, you might

20   have weakness or numbness on the other side.  She didn't

21   do any of that.  That was a problem.

22          Then she didn't consider -- and we talked about

23   this earlier but I want to repeat it -- she didn't

24   consider that -- well, she didn't even ask the patient

25   were you unconscious from the fall.
```

Veritext Legal Solutions
866 299-5127

1:17-CV-01097-LJO-JLT          EXH 1013-16

```
 1          That's an important bit of history or -- or

 2    something you would want to know about this event.  She

 3    didn't consider that, you know -- this was a patient still

 4    going through alcohol withdrawal.  Maybe she seized.  We

 5    talked about that earlier.  That should have been on her

 6    radar as a big maybe.

 7          And she didn't follow the protocol that said if

 8    the patient has escalating symptoms while still on the

 9    alcohol withdrawal protocol, you need to call the

10    physician.  She should have called the physician.

11          I -- I think it was careless on her part to

12    send her back to a cell, an unmonitored cell.  She gave

13    her a note -- or, an authorization for a lower bunk but

14    there was no monitoring of her.  She was -- went back to

15    an unknown monitored cell.

16          And she scheduled her to see a doc in two days.

17    She should have been on the phone to the doctor right

18    then.  She -- you know, I just think she -- she ignored

19    the risk of a chronic alcoholic patient who had just

20    sustained a head injury.  She should have known that.

21          I don't think she failed in her job as a
```

Mis-transcribed. Did not say "don't", See Errata Sheet 1013-34.

```
22    gatekeeper because that's what nurses are in -- in the

23    correctional setting, we are the key for our patients to

24    either get care or be denied care.  So that was the first

25    event.
```

Veritext Legal Solutions
866 299-5127

1:17-CV-01097-LJO-JLT                    EXH 1013-17

```
 1   BY MR. SPACKMAN:

 2       Q     Yeah, you're -- so you're at the bottom page

 3   four.

 4       A     Yes.  So there's two policies in place at Kern

 5   for the nurses to follow.

 6             The first one is transfer of an inmate with

 7   acute illness.

 8       Q     So let me ask you about that.

 9             Does the policy say that it is the -- that the

10   nurses must contact them?  Or could the correctional

11   officers contact?  Just notify the facility of the

12   transport?

13       A     No.  It's -- it specifically says medical

14   staff.  So Nurse Blakely was the nurse handling the care.

15   The policy says that the medical staff -- which in this

16   case is Nurse Blakely -- will notify the receiving

17   institution of the patient's pending arrival.

18             So she didn't do -- so that's one policy that

19   was violated --

20       Q     One second.

21             Got it.

22       A     Okay.  And now top of next page is the other

23   one, it's 108, it's the policy titled medical

24   transportation.  And it states that necessary inmate

25   patient information will accompany the inmate and the
```

Page 109

1   receiving facility (hospital/ER) will be notified to

2   expect the individual.

3           That's pretty typical in a correctional

4   facility.

5      Q    Right.  So there's two aspects to that, one

6   is --

7      A    Right.

8      Q    -- patient information needed to be sent with

9   the patient --

10      A    Right.

11      Q    -- and the second is a call been made to notify

12   them of it.

13      A    Right.

14      Q    And you're saying the second part of that

15   wasn't done?

16      A    Right.

17      Q    There was a referral form sent, true?

18      A    Right.

19      Q    Now -- and the issues you had with the referral

20   form, one, is it says fallen times two, but you're okay

21   saying that you're not overtly critical of that in and of

22   itself, true?

23      A    Yeah, but there was no -- I'm not overly

24   critical of that in itself.  What I am -- what they needed

25   to know, she just didn't fall.  She fell out of a top bunk

```
 1    on her head.

 2         Q    Right.  So there's other things.  And I got it

 3    from the report is --

 4         A    Right.

 5         Q    -- there should have been detail given that she

 6    fell from a top bunk?

 7         A    Right.

 8         Q    And, number two, she made an error in the

 9    medication saying the Strattera; is that right?

10         A    Correct.

11         Q    Have I now covered the things that you believe

12    were done wrong in the referral form?

13         A    Right.

14         Q    Okay.  On the -- strike that.

15              Oh.  I wanted to ask you about policy number

16    108.

17              Again, is it your reading of the policy that

18    the hospital will be notified to expect the individual,

19    that has to be done by the nursing personnel and not the

20    correctional personnel?

21         A    Oh, of course.

22              MR. SCHMIDT:  Sorry.  I'm just going to object

23    because the policy speaks for itself.

24              But go ahead and answer.

25              THE WITNESS:  These are -- these are medical

                                              Page 111
```

```
 1    policies that are aimed at health care staff.  It wouldn't
 2    make sense to have a deputy call and say, hey, we're
 3    bringing somebody over because they're not going to share
 4    medical information.
 5              You need your nurses.  Or if your doctor's the
 6    one making the -- making the decision, your doctor to call
 7    the ER doc to say we're sending this person over.  This is
 8    what's going on.  And it's just -- it -- clearly it would
 9    provide more history.
10    BY MR. SPACKMAN:
11        Q    Well, both these policies, 110 and 108, state
12    that the medical staff will notify the receiving institute
13    of the inmate patient's pending arrival.
14        A    Right.
15        Q    Right?
16        A    Right.
17        Q    And if -- as long as they notify the facility
18    of the pending arrival, they've complied with these
19    policies.  Those aspects of the policies?  True?
20        A    No, not true.  No.  The phone call from health
21    care provider to health care provider is to share health
22    care information.  Why is this patient coming.  What
23    happened.
24              You know, so they can be ready to provide care
25    to that.  Not just that they're coming.  I mean, that
```

Page 112

1   wouldn't make sense.  You know, we're sending an inmate.

2   Here they come.  You need to know why the patient is

3   coming and give medical information over the phone.

4       Q    Okay.  Even though the policy doesn't say that.

5   The policy says to notify to expect the individual?

6       A    Oh, I'm sure the intent of the policy is they

7   are going to share medical information with the receiving

8   facility.

9       Q    Instead of Strattera she would have said the

10  patient had been on Celexa; is that right?

11      A    Right.

12      Q    Do you have any reason to believe that that

13  misinformation, saying Strattera instead of Celexa,

14  altered the care over at the hospital?

15      A    No.  But I think it's just another example of

16  careless -- the careless assessment of this patient

17  that -- or, the careless care given to this patient.

18      Q    Do you have any reason to believe that that

19  misinformation saying Strattera instead of Celexa in any

20  way caused harm to this patient?

21      A    No.

22      Q    And the other thing you mentioned was she

23  should have mentioned in that referral form that the

24  patient had fallen from a higher -- a top bunk; is that

25  right?

```
 1      A     Right.  I mean, there's a -- there's a
 2  difference between falling and landing on your butt, you
 3  know, from standing, to falling out of a top bunk, which
 4  is four or five feet off the ground, and landing on your
 5  head.  There's, you know, a huge different impact to the
 6  patient.
 7      Q     You had read the statement of the roommate that
 8  described the first fall --
 9      A     Right.
10      Q     -- as landing first on her head, or something
11  to that effect; is that right?
12      A     Right.
13      Q     Was that history ever given to Rowena Blakely?
14      A     Yeah.  I went back to Deputy Randi Allen's
15  deposition testimony yesterday, and she did say that she
16  gave that information to nurse Rowena Blakely.
17      Q     Okay.  The first -- did Deputy Allen say that
18  the first impact from the fall was on the patient's head,
19  or words to that effect?
20      A     I can't remember the exact wording.  I know
21  specifically the roommate said that.
22      Q     Right.
23      A     And I know that Deputy Allen knew that.  And
24  she -- she did testify that she shared that information
25  with Nurse Blakely.
```

Page 114

```
1        A      She did provide care when she was in suicide
2   watch one time.
3        Q      Do you have any criticisms about that care?
4        A      No.
5        Q      Okay.  So have you now -- have we now covered
6   all of the criticisms you have of the care provided by
7   Nurse Blakely to this patient?
8              MR. SCHMIDT:  Objection; vague and ambiguous,
9   overbroad.
10             THE WITNESS:  Based on the documents to date
11  that I have reviewed, yes, those are my opinions.
12             If there's something else that comes out,
13  something could change.
14  BY MR. SPACKMAN:
15       Q      You had mentioned training.  Do you have any
16  criticisms about training in this case?
17       A      I do.  And I got -- Nurse Blakely's
18  deposition -- she testified in her deposition that she had
19  never received training on how to care for patients with,
20  you know, chronic alcohol -- chronic alcoholics going
21  through alcohol withdrawal.  She had never received
22  training on the nursing protocols.
23             And that's another thing I want to bring up
24  about the nursing protocols, that if you -- if you look at
25  all the nursing protocols, on the last page of each
```

Page 117

```
 1   nursing protocol, it describes -- there's a statement at
 2   the end of each protocol that says that the nurses will be
 3   authorized to use this protocol if A, B, C, and D have
 4   happened.
 5            One of them is they have to be a graduate from
 6   a nursing school.  She got that one.  But one of them
 7   is -- states that the nurse will pass with an 80 percent
 8   better or more score the competency testing for the
 9   protocols.  And I couldn't find anywhere in her training
10   she had ever been given those competency tests.
11            So when she testified in deposition that I've
12   never been trained, I mean, it kind of collaborates for me
13   that -- that maybe she was never trained in how to use
14   these protocols.
15       Q    Okay.  Any other comments on lack of training?
16       A    Let me get there.
17            MR. SCHMIDT:  We've been going for about an
18   hour.  Let's take a five-minute break.
19            MR. SPACKMAN:  Okay.  We're nearing the end.
20            MR. SCHMIDT:  Okay.
21            THE WITNESS:  Do you want me to answer the
22   question that's out or --
23   BY MR. SPACKMAN:
24       Q    Let's answer the pending question and take a
25   break.
```

Page 118

1    A    Okay. There's -- there's a policy and

2    procedure in Kern that talks about annual training updates

3    for the nurses. And it -- it states there's a minimum of

4    eight hours every two years, which, in my calculation is

5    like four hours a year, that the nurses would be provided

6    training addressing issues that could lead to

7    life-threatening situations.

8         And it goes on to list, you know, the

9    curriculum, physical assessment, universal precautions,

10   documentation, blah, blah, blah, all the different things

11   that -- that Kern County itself or the hospital authority

12   itself is going to give all these nurses.

13         According to Nurse Blakely in both her

14   deposition and when I looked at her training files that

15   were received for review in my supplemental report, she

16   testified that the training she gets is maybe two hours if

17   she did it straight through, two hours a year.

18         And when I looked at the records for the period

19   of time from 2012 through the event with Mrs. Scalia, she

20   didn't get any of this training.

21    Q    Which training?

22    A    Physical assessment --

23    Q    What page are you referring to?

24    A    Let -- let me go back. Let me go back and take

25   away the word any.

```
 1              Page three of five on my --
 2      Q       Rebuttal?
 3      A       -- rebuttal.
 4              So -- so I don't see any documentation of
 5      training in physical assessment.  I don't see any
 6      documentation of training in signs and symptoms of an
 7      emergency.  I don't see any training in response to an
 8      emergency.  I don't see any training regarding transfer of
 9      patients to appropriate medical facilities.
10              What I do see in that two-year period before
11      Mrs. Scalia was in her care, she was trained about OSHA.
12      She was trained on how to fax PHI.  She was given training
13      on HIPAA.  She was given training on how to wash her
14      hands.
15              Training on how to collect the blood glucose
16      specimen.  How to use the EMR.  There was training for fit
17      testing, which is, you know, the mask you would wear if
18      you're -- if there's an airborne illness.  And she was
19      given training on PREA and CPR.
20      Q       Did those come from her -- from the
21      documentation, that list of items she's trained on, or is
22      that from her recollection in her depo?
23      A       Page -- no.  That is in the policy.  That is in
24      the policy for Kern Medical.
25      Q       My -- listen to my question.
```

Veritext Legal Solutions
866 299-5127

1:17-CV-01097-LJO-JLT                    EXH 1013-27

1   did not violate the Rule 26(b)(4)(c)(2).

2         And another provision is though -- so that I

3   believe that that issue is moot.  I just want to clarify

4   that for the record.

5         So, nothing further.

6   BY MR. SPACKMAN:

7     Q    Okay.  I've looked through your report -- and

8   you probably know your own reports better than I -- but I

9   feel like we've covered everything here today.

10         Are there any additional criticisms of my two

11   clients, Nurse Blakely and the correctional facility, that

12   we haven't explored today?

13     A    Well, other than what's in my two reports and

14   what we've talked about today, unless I have -- you know,

15   receive additional documentation, yeah, I think the two

16   reports and my testimony have covered it all.

17     Q    Do you think we missed anything today in the

18   depo that is in your report?

19         MR. SCHMIDT:  I'm going to object; calls for

20   speculation.  I think the reports --

21         MR. SPACKMAN:  They do --

22         MR. SCHMIDT:  -- speak for themselves.

23   BY MR. SPACKMAN:

24     Q    They do but I just want to make sure you're not

25   perceiving something.  I've done my best to cover it.

Page 122

```
 1              Of course we haven't covered every word in your
 2    reports, but as far as categories of criticisms, you --
 3        A    Right.
 4        Q    -- think we've covered them all?
 5        A    Right.  I can look in here, you know, and one
 6    of the things we didn't talk about today but it is in my
 7    report, that, you know, at minimumly -- minimally
 8    Ms. Blakely should have, you know, kept the patient to
 9    monitor her over a period of time.  She was -- she was
10    right there in the infirmary.  It would have made sense.
11        Q    You did mention that.
12        A    Did I mention that?
13        Q    Yeah, you mentioned that.
14        A    See, I can't --
15        Q    You got it.
16        A    My memory's not quite as good --
17        Q    That she should have sent her back.  She should
18    have had some way of continuing to monitor her.
19        A    Right.  Right.
20        Q    Okay.
21        A    So, yeah, other than what's in the reports and
22    what we've talked about today, unless you -- unless you
23    send me more things to review or that there's new
24    information that comes out, I think we've covered it.
25        Q    If Nurse Blakely had performed the neuro exam
```

                                                    Page 123

1:17-CV-01097-LJO-JLT                    EXH 1013-29

```
 1        A     I think what we talked about earlier, it didn't

 2   matter if it was first her head or her knee or her elbow.

 3        Q     Yeah, you have to answer my question though.  I

 4   know you don't want to.

 5              But do we know that she even had that

 6   information?

 7              MR. SCHMIDT:  Objection; vague and ambiguous,

 8   overbroad.

 9              THE WITNESS:  What we do know is that she

10   fell -- what Blakely did know is that she fell and hit her

11   head.  That is the piece of information that's critical.

12   BY MR. SPACKMAN:

13        Q     Right.  Right.  And so that leads me to the

14   next question here -- I just want a yes or no -- do you

15   think every patient who reports hitting their head who

16   happens to be an alcoholic, standard of care requires that

17   patient to be kept from monitoring or sent to the

18   hospital?

19              MR. SCHMIDT:  Objection; vague and ambiguous,

20   incomplete hypothetical.

21              THE WITNESS:  I don't think they all need to be

22   sent to the hospital, but I think you need to monitor your

23   alcoholic patients for bleeding when they have a head

24   injury.  Because it doesn't require a significant head

25   injury in an alcoholic to cause a problem.
```

Page 130

```
 1              So that's -- I answered your question.
 2    BY MR. SPACKMAN:
 3       Q     When you say --
 4       A     You just didn't get the answer you wanted.
 5       Q     Well, when you said head injury, are you -- are
 6    you saying that any time a patient reports any impact to
 7    their head it's now a head injury that requires
 8    monitoring?
 9       A     Anything from your neck up is your head.
10       Q     I understand.
11       A     And she bumped her head.
12       Q     So that -- I just want to make sure this is the
13    position you're taking in this case.  And I want to make
14    it clear.
15              If a patient who's an alcoholic has any impact
16    to their head, standard of care requires that patient to
17    be either kept for monitoring or sent to the hospital,
18    yes?
19              MR. SCHMIDT:  Objection; misstates the
20    testimony, vague and ambiguous, incomplete --
21              MR. SPACKMAN:  And if you can't --
22              MR. SCHMIDT:  -- hypothetical.
23    BY MR. SPACKMAN:
24       Q     -- answer that with a yes or no, let me know
25    and I'll rephrase it until you can.
```

```
 1   STATE OF NEVADA,          )

 2   COUNTY OF WASHOE          )  ss.

 3

 4        I, Karen Bryson, a Certified Court Reporter and

 5   notary public in and for the County of Washoe, State of

 6   Nevada, do hereby certify:

 7        That on Tuesday, May 14, 2019, at the offices of

 8   Bonanza Reporting, 1111 Forest Street, Reno, Nevada,

 9   personally appeared KATHRYN JEAN WILD, R.N., who was duly

10   sworn by me, was thereupon deposed in the matter entitled

11   herein;

12        That the foregoing transcript consisting of page 1

13   through 150 is a full, true, and correct transcript of my

14   stenotype notes of said deposition to the best of my

15   knowledge, skill, and ability.

16        I further certify that I am not an attorney or

17   counsel for any of the parties, nor a relative or employee

18   of any attorney or counsel connected with the action, nor

19   financially interested in the action.

20

21

22

23        _____

24        Karen Bryson, CCR #120

25

                                        Page 152
```

# INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please follow the directions below. If additional pages are necessary, please furnish them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make, insert the corrections on the errata sheet beside the page and line numbers.

If you are in possession of the original transcript, do NOT make any changes directly on the transcript.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet, above the designated "Signature" line.

## ERRATA SHEET

| Page | Line | | |
|------|------|--|--|
| 51 | 1-2 | Change: | entire protocol was missing (:) the whole monitoring component |
| | | Reason: | Remove the (:) period |
| 52 | 15 | Change: | SEWA to CIWA |
| | | Reason: | Wrong spelling |
| 56 | 11 | Change: | Suicide "Watch" |
| | | Reason: | Missed word |
| 97 | 14-15 | Change: | "unKnown monitored cell" to unmonitored cell |
| | | Reason: | Miss-Quoted |

| Page | Line | |
|------|------|---|
| | | Change: _"I don't think" to "I think"_ |
| 97 | 21 | Reason: _MISS-Quoted_ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |

_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made. I certify that the transcript is true and correct.

_Kathlie Ile_
**Signature**

_7/2/19_
**Date**