**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN SCALIA, individually and as successor in interest of Decedent Kimberly Morrissey-Scalia,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>COUNTY OF KERN, et al.,<br><br>　　　　　　　Defendants. | Case No.: 1:17-cv-1097- NONE - JLT<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SANCTIONS DUE TO SPOLIATION<br><br>(Doc. 86) |

　　Kimberley Morrissey-Scalia died after falling from her bunk while a pre-trial detainee in the custody of the County of Kern. The decedent's husband, John Scalia, seeks to prosecute this action against Rowena Blakely, the nurse who saw Ms. Morrissey-Scalia following her falls from the bunk. (*See generally* Doc. 15)

　　Plaintiff seeks the imposition of sanctions against Defendants for the spoliation of video evidence of Ms. Morrissey-Scalia at the Lerdo Pretrial Facility, including her visits to the infirmary. According to Plaintiff, Defendants despoiled relevant video evidence despite a demand that the videos be preserved. (Doc. 86) The County of Kern and Ms. Blakely oppose the request for sanctions. (Docs. 90, 91) Previously, the Court found the motion suitable for decision without oral arguments, and the motion was taken under submission. (Doc. 94) For the reasons set forth below, Plaintiff's motion for sanctions is **DENIED**.

1

**I.      Background**

Kimberley Morrissey-Scalia was taken into custody by Kern County Sheriff Deputies following an incident with her roommate on June 22, 2016. (Doc. 15 at 10, ¶ 17) She had "a history of mental illness and treatment," as well as "medical and mental health problems involving prescription medication and alcohol." (*Id.* at 11, ¶18) At the time of the arrest, Ms. Morrissey-Scalia "was suffering from serious mental illness, and may not have been properly taking her prescribed psychotropic medicine." (*Id.*)

According to Plaintiff, the intake and medical staff were aware of the medical history, including " a history of suicide attempts in the past." (Doc. 15 at 11-12, ¶ 18) As a result, intake staff placed Ms. Morrissey-Scalia on suicide watch after booking. (*Id.* at 12, ¶ 18) On June 24, 2016, a mental health therapist spoke to Ms. Morrissey-Scalia "and took her off suicide watch." (Doc. 15 at 12, ¶ 20) Three days later, "Ms. Morrissey-Scalia transferred from the Central Receiving Facility to the Lerdo Pre-Trial Facility, in Bakersfield, and housed in B-Pod." (*Id.*, ¶ 22, emphasis omitted)

At approximately 11:15 p.m. on June 27, 2016, Ms. Morrissey-Scalia, fell from her bunk bed— a height of approximately five feet—and struck her head on the concrete. (Doc. 15 at 12, ¶ 23) She "pressed her emergency intercom button" and reported to the responding detention deputies that "she had fallen from her bunk, hitting her head, arm, and leg, and had sustained injuries." (*Id.* at 13, ¶ 23) Plaintiff asserts Ms. Morrissey-Scalia "was unable to walk," and was transported to the infirmary in a wheelchair. (*Id.*, ¶ 24)

Nurse Rowena Blakely saw Ms. Morrissey-Scalia at the infirmary. (Doc. 15 at 13, ¶ 25) According to Plaintiff, Blakely "knew of and administered [Ms. Morrissey-Scalia's] medications at times during [her] incarceration at Lerdo," and as a result was aware that the medications "included Librium, Klonopin and Straterra." (*Id.* at 13-14, ¶¶ 26-27) Plaintiff asserts Blakely "knew or had reason to know that these drugs caused dizziness and other dangerous 'side effects.'" (*Id.* at 14, ¶ 27) Further, Plaintiff contends Blakely was aware Ms. Morrissey-Scalia's treatment for alcohol withdrawal from the medical chart. (*Id.*, ¶¶ 28-29)

Plaintiff alleges Blakely "observed that [Ms. Morrissey-Scalia] could not ambulate on her own," and was informed by Ms. Morrissey-Scalia that she "hit[] the left side of her face, her left elbow, and

her left knee, among other things." (Doc. 15 at 13, ¶ 25)  Plaintiff alleges an abrasion to the "left knee, with active bleeding, was visible." (*Id.*)  Plaintiff asserts Blakely was also aware of "a bump over [the] left eyebrow from the fall." (*Id.* at 14, ¶ 30)  According to Plaintiff, Blakely was "an RN and triage nurse," and "knew or should have known" that Ms. Morrissey-Scalia "faced a serious medical need for evaluation and treatment regarding possible traumatic brain injury and that in the case of traumatic brain injury immediate medical treatment is required to avoid bleeding in the brain, brain swelling, subdural hematoma, and other progressively serious results including death." (*Id.* at 14, ¶ 32)  In addition, Plaintiff alleges Blakely "knew or should have known the risks of an untreated brain injury, that an X-ray or CT scan was necessary to rule out a traumatic brain injury, and that she should contact a medical doctor to request such treatment." (*Id.*, ¶ 33)

Plaintiff asserts Blakely "spent less than ten minutes with the Decedent; and, instead of promptly summoning urgent medical care or effectuating an immediate transfer of … care to the nearest emergency trauma center, in view of the … serious head injuries," cleared Ms. Morrissey-Scalia to return to the B-Pod.  (Doc. 15 at 13, ¶ 25, emphasis omitted)  Plaintiff alleges Blakely "did not contact a medical doctor before sending [her] back to a jail cell." (*Id.* at 14, ¶ 34)  Plaintiff alleges there was not "any immediate follow-up plan to frequently monitor" Ms. Morrissey-Scalia. (*Id.*)

Ms. Morrissey-Scalia was "re-housed in a different cell" with a bunk bed. (Doc. 15 at 16, ¶ 47)  On June 28, 2016, "at some point prior to 2:24 in the morning," she fell to the floor, used the emergency intercom, and "reported that she was throwing up and needed to see a nurse." (*Id.*, ¶ 48)  Plaintiff asserts this was "a clear indication of the serious head injury … sustained." (*Id.*)  At 2:24 a.m., Ms. Morrissey-Scalia was found "lying on the floor of her cell, unconscious, but breathing," and "still vomiting." (*Id.* at 17, ¶ 49)  Plaintiff alleges that Ms. Morrissey-Scalia "babble[d] incoherently" to the responding deputy, who "called for the medical staff that worked in Lerdo jail on her hand-held radio." (*Id.*)  Blakely responded to the call around 2:30 a.m., and the responding deputies "placed Ms. Morrissey-Scalia on a gurney, and transported her to the Lerdo jail infirmary accompanied by [Blakely]." (*Id.*, ¶¶ 50-51)

Plaintiff alleges that at the infirmary, Blakely took vital signs and "charted a bump to the … left eyebrow that she stated was from the first fall." (Doc. 15 at 17, ¶ 52)  At 2:37 a.m., Blakely "requested

3

1  via 911 Priority 2 transport from Lerdo to Kern Medical Emergency Room." (*Id.*, ¶ 54) The
2  ambulance arrived around 2:53 a.m., at which time Blakely informed the responding EMTs that Ms.
3  Morrissey-Scalia "was possible ETOH." (*Id.* at 18, ¶ 55) The ambulance departed Lerdo at 3:15 a.m.
4  and arrived at Kern Medical Center around 3:40 a.m. (*Id.*, ¶ 56) Plaintiff asserts, "The EMT reported
5  [Ms. Morrissey-Scalia] was confused stating she was resting with animals." (*Id.*) A physician saw Ms.
6  Morrissey-Scalia at approximately 4:00 a.m., and she was "admitted at approximately 5:40 a.m." (*Id.*,
7  ¶ 57) An emergency craniotomy surgery was performed at approximately 8:20 a.m. (*Id.*, ¶¶ 57, 63)

8      Ms. Morrissey-Scalia "was placed on life-support, which included breathing tubes." (Doc. 15 at
9  19, ¶ 63) Her breathing tubes were removed on June 30, 2016, and Ms. Morrissey-Scalia "was
10 pronounced dead on July 1, 2016, at or around 12:05 a.m." (*Id.* at 20, ¶ 63) "The cause of her death
11 was blunt injury to her head, caused by falling off her bunk and striking her head." (*Id.*)

12     According to Plaintiff, Blakely's action in sending "Ms. Morrissey-Scalia back to jail instead
13 of to the hospital after the first fall caused the death of Ms. Morrissey-Scalia." (Doc. 15 at 18, ¶ 59)
14 In addition, Plaintiff contends Blakely caused a "delay in the transportation of Ms. Morrissey-Scalia to
15 the hospital after the second fall, [which] caused the death of Ms. Morrissey Scalia." (*Id.*, ¶ 58)
16 Furthermore, Plaintiff asserts Blakely made a "false report to the EMTs that Ms. Morrissey-Scalia was
17 under the influence of alcohol," which caused a delay in the treatment … [and] in turn, led to her
18 death." (*Id.*, ¶ 60)

19     On August 14, 2017, Plaintiff initiated this action by filing a complaint (Doc. 1), which he
20 amended on December 20, 2017 (Doc. 15). In the First Amended Complaint, Plaintiff sought to hold
21 the County of Kern; Kern County Hospital Authority; Kern County Sheriff Donny Youngblood;
22 deputies Joel Swanson, Randi Allen, and Misty Miller; and nurse Rowena Blakely liable for the
23 following causes of action: (1) deprivation of rights under the Fourth and Fourteenth amendments to
24 the U.S. Constitution, (2) municipal and supervisor liability, (3) violation of civil rights under Cal. Civ.
25 Code § 52.1(b), (4) failure to summon medical care in violation of Cal. Gov't Code § 845.6, (5)
26 negligence and premises liability, and (6) medical negligence. (*See generally* Doc. 15 at 30-43)

27     Following stipulations of the parties and various motions, the only claims remaining are the
28 First, Third, and Sixth Causes of Action against Blakely; and medical negligence against the County

"arising from its ownership of Kern Medical Center." (*See* Docs. 28, 53-54, 58-59, 63-64, 75)

In opposing the defendants' motion for summary judgment, Plaintiff asserted for the first time that Kern County Hospital Authority failed to maintain video surveillance recordings at the jail infirmary and asserted evidentiary sanctions should be imposed against KCHA. (Doc. 69 at 77-84) The Court declined to consider Plaintiff's request for sanctions at that time, noting it "does not comply with the federal or local motion practice rules." (Doc. 75 at 4, n. 2) Nevertheless, the Court noted it agreed with the defendants at that time that Plaintiff presented "no evidence KCHA had possession or control over the videotapes, or otherwise committed spoliation of the tapes" and the County "appear[ed] to be the sole party responsible for the videotapes," but sanctions were not brought against the County. (*Id.*) Because the Court was "concerned that potentially relevant evidence was destroyed, intentionally or otherwise, despite a timely preservation request," the Court authorized Plaintiff to "renew his request for sanctions in a properly noticed motion." (*Id.*)

Plaintiff now seeks spoliation sanctions "on the grounds that the County of Kern and KCHA Defendants despoiled critical surveillance footage from the infirmary in the Lerdo Pretrial Facility (the Kern County Jail) from the times of Defendant Rowena Blakely's interactions with the decedent, Kimberly Morrissey-Scalia, as well as any other footage from the county jail that depicted the decedent." (Doc. 86) Blakely opposes the motion, asserting it is frivolous as to her and KCHA because they did not have "access to, control over, or possession of the video equipment in the infirmary." (Doc. 90 at 2) Similarly, the County opposes the request for sanctions, asserting the motion is untimely and Plaintiff is attempting "to resurrect potential liability against the Kern County Sheriff's Office and the County personnel which were previously dismissed." (Doc. 91 at 12)

## II.    Spoliation of Evidence

"The failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." *Thompson v. U.S. Dep't of Housing & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003). Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (internal quotation marks omitted).

A party seeking spoliation sanctions "must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006) (citation, internal quotation marks omitted). The bare fact that evidence has been altered or destroyed, however, "'does not necessarily mean that the party has engaged in sanction-worthy spoliation.'" *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 626 (C.D. Cal. 2013) (quoting *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799-800 (N.D. Tex. 2011)).

The Court has the inherent power to control the judicial process and to impose sanctions for spoliation that, in its discretion, are appropriate. *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 824 (9th Cir.2002). For example, as a proper sanction, the Court may instruct the jury that it may infer the lost evidence would have been unfavorable to the spoiling party. *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). Likewise, when the evidentiary loss is caused by an accident, or is the result of innocent action, the Court may reject a request for sanctions. *Medical Laboratory Mgmt. Consultants*, 306 F.3d at 824. The Court's authority to sanction must be exercised "with restraint and discretion" and only as necessary to address the wrong that has occurred. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). Thus, any sanction imposed "should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

### III.     Discussion and Analysis

Plaintiff asserts that shortly after the death of Ms. Morrissey-Scalia, "counsel for Plaintiff sent detailed evidence preservation demand letters to both the County of Kern ('County') and the Kern County Hospital Authority." (Doc. 86 at 9) Plaintiff notes the preservation letter to the County was addressed to both the Lerdo Facility and Sheriff Youngblood via U.S. Mail, facsimile, and email on July 22, 2016. (*Id.* at 9, citing Exh. C-G [Docs. 86-7, 86-8, 86-9, 86-10, and 86-11]) Counsel served a

1    preservation letter to Kern Medical Center—which was mailed to both the KCHA Board of Governors

2    and the Risk Manager for KMC— on July 26, 2016. (*Id.*, citing Exh. A-1, A2 [Docs. 86-3, 86-4]) In

3    addition, Plaintiff reports the letter "was personally served[] on December 27, 2016" on the KCHA

4    Board of Governors. (*Id.*) The letters "referenced the need to secure and preserve all video footage

5    depicting Ms. Scalia in the jail." (*Id.* at 9)

6          Plaintiff reports video cameras in the Lerdo infirmary "recorded footage to a harddrive," and

7    footage was to be "retained for no less than 13 months." (Doc. 86 at 10, citing Reynolds Depo. 35:4-

8    36:13). On May 24, 2019, David Reynolds testified there were approximately seven cameras in the

9    infirmary during June 2016, which covered the path of travel, outside of the cells, and "the front area

10   of the infirmary." (Doc. 86-13 at 5-6, Depo. 35:8-14, 36:3-8) According to Mr. Reynolds, the footage

11   was transmitted to a "recording drive, of some type," in the electrical room. (*Id.* at 7, Depo. 44:10-21)

12   However, Mr. Reynolds also testified "critical failures … [had] been happening with the recording and

13   storing of the video," which resulted in "two separate emergency projects" to add storage since 2016.

14   (Doc. 91 at 76, Depo. 45: 1-5) Mr. Reynolds stated that due to the "critical systems failure," he had

15   reason to believe that video footage was not stored for thirteen months, as was expected with the

16   retention policy. (*Id.* at 78, Depo. 48:10-23) Mr. Reynolds explained: "Some of the servers had less

17   than adequate software that was installed with them to index the video when [he] came on, and there

18   was missing videos." (*Id.* at 79, Depo. 49:9-14) Even after one emergency project, there "was

19   missing video at least 12 to 16 months." (*Id.*, 49:18-20)

20       **A.**     **Timeliness of the Motion**

21         As an initial matter, the County argues Plaintiff's motion for sanctions is untimely, because

22   "Plaintiff was aware of the absence of video recording prior to the service of discovery responses

23   served on 05/17/19" and all non-dispositive motions were to be filed no later than June 10, 2019.

24   (Doc. 91 at 8) In addition, the County notes that while the Court authorized Plaintiff to "renew his

25   request for sanctions in a properly noticed motion," "[l]aches would appear to derail such an

26   argument." (*Id.* at 8, 12) In response, Plaintiff asserts only: "This motion is timely." (Doc. 92 at 2,

27   citing Doc. 75 at 4, n.6)

28         Previously, the Court noted Plaintiff's request for sanctions was raised in opposition to the

motion for summary judgment, and found it was "not obligated to consider Plaintiff's request that does not comply with the federal or local motion practice rules." (Doc. 75 at 4, n. 6) "Nevertheless, the Court [was] concerned that potentially relevant evidence was destroyed, intentionally or otherwise, despite a timely preservation request," and indicated "Plaintiff may renew his request for sanctions in a properly noticed motion" on September 6, 2019. (*Id.*) Significantly, the Court did not previously make any findings regarding the timeliness of the request for spoliation sanctions.

The County reports that Plaintiff has been aware of the lack of video evidence since the County served its responses to Plaintiff's Request for Production of Documents. (Doc. 91 at 11) Request for Production No. 2 included a request for "Photographs, video recordings, audio recordings, drawings, sketches, and all other recordings or depictions of DECEDENT during the period of time during which the INCIDENT unfolded." (*Id.* at 25) With Request for Production No. 5, Plaintiff sought "All photographs, drawings, or video recordings of the premises where the INCIDENT occurred generated by any of the defendants, or any of any defendant's [sic] agents…. Which show the premises as they appeared on the date of the INCIDENT." (*Id.* at 26-27) The County did not identify any video footage of the infirmary in response to the Requests on October 30, 2018. (See *id.* at 35) Four months later, Plaintiff's counsel contacted the County and indicated the response was insufficient because the County failed "to respond to each of the 13 categories"—including the request for video footage—and requested the County's availability for a telephonic conference with the assigned magistrate judge. (*Id.* at 41-42) On March 4, 2019, the County responded it had "produced all documents that exist and are responsive to the request including the subcategories." (*Id.* at 41) Furthermore, the County asserted that "[n]o video has ever existed." (*Id.*) The discovery dispute was not pursued with the Court.

On April 12, 2019, Plaintiff served his Requests for Admission, Set One— which included only requests related to video from the Lerdo infirmary— and the County responded on May 17, 2019. (*See* Doc. 91 at 53- 59) Plaintiff's Request Nos. 1 and No. 2 stated: "The County of Kern admits that the Kern County Sheriff's Office maintained video cameras in the Lerdo Pre-Trial Facility Infirmary on June 27, 2016" and June 28, 2016. (*Id.* at 53) The County admitted both facts. (*Id.*) With Request Nos. 3 and 4, Plaintiff sought admission that "video footage taken with video cameras maintained by the Kern County Sheriff's Office in the Lerdo Pre-Trial Facility Infirmary on June 27, 2016 [and June

8

28, 2016] was recorded and stored in a database." (*Id.* at 53, 54) The County responded:

> Defendant lacks sufficient information and belief to admit or deny this request, and therefore denies the request on this basis. However, defendant admits the following: The surveillance system is designed for video footage to be recorded and stored on a computer data base. However, the recording system during the time in question was unreliable, and did not always properly store the video footage in a retrievable format. The system was also designed to overwrite stored information after thirteen months. Defendant lacks any information that the data on the dates in question was accurately recorded and subsequently retrieved within thirteen months.

(*Id.* at 53-54) The County indicated it was unable to say whether the video footage in question was "stored in a database [and] kept for more than 3 months." (*Id.* at 55) A week after the County served its responses, David Reynolds testified at his deposition regarding the presence of the cameras in the infirmary and difficulties with the recording system. (*See* Doc. 86-13 at 5-6)

Based upon this timeline, the County argues Plaintiff has been aware of the lack of video footage since October 2018 and asserts the motion regarding the discovery dispute and spoliation "could have been filed over a year before the Motion was actually filed." (Doc. 91 at 12) Plaintiff does not dispute this fact. However, Plaintiff made a tactical decision to not alert the Court to the discovery issue—even when the Court held telephonic conferences with the parties regarding discovery disputes on February 20 and May 24, 2019—and instead raised the issue of spoliation for the first time when opposing summary judgment on July 30, 2019. (*See* Doc. 69 at 77-84)

Significantly, courts have repeatedly determined that delay filing a motion for spoliation sanctions may result in the motion being denied as untimely. *See, e.g., Larios v. Lunardi*, 442. F.Supp. 3d 1299, 1305 (E.D. Cal. 2020) ("it is well-established that unreasonable delay can render a spoliation motion untimely") (citations omitted); *Cottle-Banks v. Cox Comm's., Inc.*, 2013 WL 2244333 at *16 (S.D. Cal. May 21, 2013) (denying a motion for spoliation as untimely where plaintiff waited almost nine months to move for sanctions); *Olson v. Shawnee County Bd. of Comm'rs.,* 7 F.Supp.3d 1162, 1200 (D. Kan. 2014) (finding "no rationale for the delay" where the spoliation motion rested on facts that the plaintiff learned a year prior to raising the issue). Thus, a motion regarding spoliation "should be filed as soon as reasonably possible after discovery of the facts that underlie them motion." *Goodman v. Praxair Services, Inc.*, 632 F. Supp. 2d 494, 506-08 (D. Md. 2009).

Courts have also deemed the issue is untimely when the spoliation is not raised until after the

close of discovery, or in opposition to summary judgment. *See, e.g., Larios*, 442. F.Supp. 3d at 1305-06; *Olson*, 7 F.Supp.3d at 1200; *Ferrone v. Onorato*, 2007 WL 2973684 *10 (W.D. Pa. Oct. 9, 2007), *aff'd*, 298 Fed. App'x. 190 (3rd Cir. 2008) (spoliation argument should have been made in "appropriate discovery motion," and not in "opposition to summary judgment"); *Navedo v. Nalco Chem., Inc.*, 848 F. Supp. 2d 171, 204 (D.P.R. 2012) (holding spoliation motion untimely because, in addition to the other factors, it was filed after summary judgment); *see also Glenn v. Scott Paper Co.*, 1993 WL 431161 at *17, n.3 (D.N.J. Oct. 20, 1993) (spoliation argument presented to defend a summary judgment motion was untimely, as the plaintiff did not raise the issues "during the discovery phase or bring them to the attention of the magistrate [judge]"); *Sherwood Invs. Overseas Ltd. Inc. v. Royal Bank of Scotland*, 2015 Bankr. LEXIS 2513 at *16 (M.D. Fl. July 22, 2015) (observing that "[s]poliation issues should be broached well in advance of any dispositive motion deadline," and finding the motion was untimely when the party seeking sanctions "has not offered any explanation for its delay in waiting over a year from when it discovered the facts upon which its spoliation motion is based").

In *Rhabarian v Cawley*, the plaintiff raised the issue of spoliation in opposition to summary judgment. *Id.,* 2014 WL 546015 at *3 (E.D. Cal. Feb. 11, 2014). This Court noted the plaintiffs delayed nine months before raising the issue with the Court, and "the time to raise these issues was during discovery, and not after the deadline for dispositive motions." *Id.*, 2014 WL 546015 at *3 (E.D. Cal. Feb. 11, 2014). Though the Court found the "allegations of spoliation [were] troubling," the Court declined to consider the allegations because the issue was not raised in a timely manner. *Id.* Similarly, in *Larios*, the Court found the plaintiff's spoliation motion was untimely where the plaintiff "waited nine months to raise a claim of spoliation—after discovery closed and the dispositive motion deadline passed"—and raised the issue for the first time while opposing summary judgment. *Id.*, 442 F.Supp at 1036. The Court noted, "Plaintiff… does not explain why his nine-month delay is reasonable; nor can the Court identify a sound basis for reaching that conclusion." *Id.* Thus, the Court declined the motion for spoliation sanctions. *Id.*

Likewise, here, Plaintiff fails to offer any reason for the delay in raising the issue of spoliation to the Court. As early as October 2018, Plaintiff was aware of the County would not produce any video footage, and even indicated in March 2019 that the discovery dispute would be raised with the

10

Court.  (*See* Doc. 91 at 41-42)  Despite this representation to the County's counsel, the issue of spoliation was not raised with the Court until Plaintiff opposed summary judgment in July 2019.[1] When the Court indicated Plaintiff could file a properly-noticed motion to raise the issue of spoliation sanctions—which Plaintiff had failed to do in opposing summary judgment—Plaintiff again delayed more than six weeks, until the eve of the scheduled trial-setting conference.  He makes no effort to explain these delays in response to the County's argument that the request for spoliation sanctions was untimely, and the Court is unable to find the delay of Plaintiff in raising the issue was reasonable, particularly as to the County.  *See Larios,* 442 F.Supp at 1036; *Goodman*, 632 F. Supp. 2d at 506-08.  Consequently, Plaintiff's motion for spoliation sanctions is **DENIED** as untimely.

## B.   Merits of the Motion

Even if Plaintiff had raised the issue of spoliation in a timely manner, his motion for sanctions fails on the merits. As noted above, a party seeking spoliation sanctions must demonstrate (1) the party having control over the evidence (2) had a duty to preserve the evidence, but (3) destroyed the records with a culpable state of mind and (4) the destroyed evidence is relevant to the party's claim or defense. *See Apple, Inc. v. Samsung Elecs. Co*., 888 F. Supp. 2d 976, 996-97 (N.D. Cal. 2012); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d at 1078.

### 1.   Existence of the video evidence

As an initial matter, KCHA and Blakely challenge the spoliation motion, in part, on the grounds that "Plaintiffs motion assumes, but submits no evidence, that actual video footage of interactions between Ms. Blakely and the decedent in the infirmary existed."  (Doc. 90 at 7) The County previously asserted that it had "produced all documents that exist" and "[n]o video has ever existed."  (Doc. 91 at 41)  According to KCHA, "Plaintiffs motion concludes that the footage existed and was despoiled, without direct evidence of it."  (Doc. 90 at 7)  Similarly, the County asserts Plaintiff identifies "no evidence that… any video was actually recorded on the server."  (Doc. 91 at 14-15)

Plaintiff asserts video cameras in the Lerdo infirmary "recorded footage to a harddrive," and

---

[1] Notably, the motion now pending before the Court is the first time Plaintiff seeks spoliation sanctions against the County. Plaintiff previously asserted KCHA was responsible spoliation of the video footage, and sought sanctions only against KCHA in opposing summary judgment. (Doc. 69 at 77-84; Doc. 75 at 4, n. 2)

1 footage was to be "retained for no less than 13 months." (Doc. 86 at 10, citing Reynolds Depo. 35:4-
2 36:13). David Reynolds testified there were approximately seven cameras in the infirmary during
3 June 2006, which covered the path of travel; outside of the cells; and "the front area of the infirmary,"
4 which was called the "suicide watch area." (Doc. 86-13 at 5-6, Depo. 35:8-14, 36:3-8) According to
5 Mr. Reynolds, the footage was transmitted to a "recording drive, of some type," in the electrical room.
6 (*Id.* at 7, Depo. 44:10-21) However, Mr. Reynolds also testified that "critical failures … [had] been
7 happening with the recording and storing of the video," which resulted in "missing videos." (*Id.* Doc.
8 91 at 76, 79; Depo. 45:1-5, 49:9-20)

9 Thus, the evidence before the Court indicates that while cameras were installed at Lerdo Pre-
10 Trial Facility and the equipment was programmed to record, the footage may not have been stored.
11 Plaintiff presents no evidence that video footage of Ms. Morrissey-Scalia was, in fact, recorded and
12 transmitted to the servers. Instead, Plaintiff asks the Court to assume this evidence existed. However,
13 a party seeking spoliation sanctions must do more than speculate evidence exists and must present
14 evidence to the Court that the evidence existed at one time. *See Epstein v. Toys-R-Us Del., Inc.,* 277 F.
15 Supp. 2d 1266, 1277 (S.D. Fla. 2003) ("In order to prevail on a claim for the destruction of a videotape,
16 Plaintiff must at a minimum point to some facts indicating that such a video exists") (emphasis
17 omitted); *Wimbush v. Matera*, 2014 WL 7239891 at*11 (D. Md. Dec. 17, 2014) ("A successful claim
18 for spoliation of evidence cannot be premised on mere speculation on the existence of such evidence").

19 The Southern District of New York determined a plaintiff was not entitled to sanctions where
20 there was no evidence that video footage claimed as despoiled was ever recorded. *See Sachs v.
21 Cantell*, 2012 WL 3822220 at *8 (S.D.N.Y. Sept. 4, 2012). The plaintiff argued defendants "were
22 once in possession of a video surveillance tape," and asserted that, "if produced, the tape would have
23 corroborated her version of the events." *Id.* In support of her assertion that the tape existed, the
24 plaintiff submitted "a handwritten note by police at the scene that there was 'video available'" and an
25 unsworn statement indicating a video camera was pointed at a vestibule where some of the underlying
26 events occurred. *Id.* However, the defendants submitted evidence to the court "at a power failure
27 prevented their surveillance system from making any recordings during the time of the altercation."
28 *Id.* The court observed: "even assuming that a camera was pointed toward the vestibule at the time of

the incident, Plaintiff has not presented evidence that the camera was attached to a functioning recording device or that a recording was actually created." *Id.* The court found that based upon the evidence presented, it could not "infer that a surveillance video ever existed, let alone was destroyed." *Id.* Because the plaintiff had "not established that the tape existed," the court denied her motion for spoliation sanctions. *Id.* at *9.

Similarly, here, the Court is asked to assume that footage from the infirmary was properly recorded and stored on the facility's servers, despite the fact that no footage has ever been seen and the County indicated that the footage may never have existed. The County also presented evidence that its video storage was inadequate, there were videos missing from its server, and there were "critical failures … happening with the recording and storing of the video." (*See* Doc. 91 at 76, Depo. 45: 1-5) Because Plaintiff fails to present evidence that the video footage of Ms. Morrissey-Scalia in the infirmary existed at one time, the Court finds spoliation sanctions should not be imposed. *See Epstein,* 277 F. Supp. 2d at 1277; *Sachs*, 2012 WL 3822220 at *8.

2.  Control over the evidence

Spoliation sanctions are only available against the party who had possession or control of the missing evidence. *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) ("it is essential that the evidence in question be within the party's control"); *see also Allen v. Woodford*, 2007 WL 309945 at *2 (E.D. Cal. Jan. 30, 2007) (for purposes of discovery, the court may consider whether "a party can order the person or entity in actual possession of the documents to release them"). The County admits unequivocally that "through its contractors and outside vendors it had control over the video recorder and server." (Doc. 90 at 9) Plaintiff contends the Court should also find KCHA had control over surveillance footage from the infirmary at Lerdo, arguing "[a]ccess to the evidence for purposes of preserving it, as well as knowledge that there will be litigation that such evidence could be material to, is sufficient." (Doc. 86 at 12 citing *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591-592 (4th Cir. 2001)).

Plaintiff observes that the Fourth Circuit determined, a party that "does not own or control the evidence, … still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence." (*Id.* at

13, quoting *Silvestri*, 271 F.3d at 591 (emphasis omitted))  In addition, Plaintiff notes—based on *Silvestri* and its progeny— "courts have extended the affirmative duty to preserve evidence to instances when that evidence is not directly within the party's custody or control so long as the party has access to or indirect control over such evidence." (*Id.* at 14, quoting *World Courier v. Barone*, 2007 U.S. Dist. LEXIS 31714, at *2-3 (N.D. Cal. Apr. 13, 2007) (emphasis omitted))

As examples of instances in which the courts determined access or indirect control over evidence was sufficient, Plaintiff cites the following cases: *Silvestri*, 271 F.3d 583; *World Courier*, 2007 U.S. Dist. LEXIS 31714; and *Cyntegra, Inc. v. Idexx Labs., Inc.*, 2007 U.S. Dist. LEXIS 97417, at *14-16 (C.D. Cal. Sep. 21, 2007). (Do. 86 at 14)  According to Plaintiff,

> [A]pplying these authorities to the case at bar, KCHA clearly had an affirmative duty to take action to preserve the footage from the infirmary because it had unquestionable access to the evidence for purposes of preserving it by virtue of its relationship with the County (as a former County agency), it had knowledge that there would be litigation concerning the acts and omissions of its employee(s) in the infirmary based on the preservation letter, the Cal. Gov't Code § 910 claim, and the Cal. Civ. Proc. Code § 364 notice, it had indirect control over the evidence by virtue of its role of providing medical care in the infirmary and its close relationship with the County, and most notably: its contractual relationship with the County under a Memorandum of Understanding, which is discussed more, infra, imposed an obligation on KCHA to make a reasonable inquiry of the County for the surveillance footage. *See* Reynolds at 133:4-14 (a request made by a KCHA administrator or administrator to review and preserve footage would set policies and procedures into motion to attempt to satisfy it, if reasonable).

(Doc. 86 at 15)

In *Silvestri*, the plaintiff filed a products liability action against General Motors Corporation alleging a vehicle he drove—but did not own—had a defective airbag that did not deploy in during an accident.  *Id.*, 271 F.3d at 586-90. The court observed that "Silvestri did not own the vehicle, nor did he even control it in a legal sense after the accident because the vehicle belonged to his landlady's husband." *Id.* at 591.  The court found it was "apparent that Silvestri had access to the vehicle, as his attorney… and his retained experts were given apparently unlimited access to the vehicle for inspection purposes." *Id.*  Further, the court noted "the vehicle was preserved in its post-accident condition for perhaps two to three months, or more, a period during which Silvestri, his lawyer, and his experts recognized not only that they would be suing General Motors but also that General Motors should be given an opportunity to inspect the vehicle." *Id.* The owner then transferred title to his

14

insurance company, which repaired the vehicle prior to Silvestri filing suit. *Id.* at 587.

Noting that the Fourth Circuit "extended the affirmative duty to preserve evidence to instances when that evidence is not directly within the party's custody or control so long as the party has access to or indirect control over such evidence," the Northern District of California determined in *World Courier* that a defendant had sufficient access to evidence where it was in the possession of her husband. *World Courier*, 2007 U.S. Dist. LEXIS 31714, at *2-3 (citing *Silvestri,* 271 F.3d 583; *King v. American Power Conversion Corp.,* 181 Fed. App'x. 373 (4th Cir. 2006)). The defendants argued they could not be sanctioned for the destruction of a hard drive "because the spoliator… [was] not a party to this action." *World Courier*, 2007 U.S. Dist. LEXIS 31714, at *2. The court observed, "the record indicates that while Jay Barone destroyed the hard drive, Defendant Doneen Barone was in regular contact with her husband about this matter during the relevant time period and the hard drive was kept at the Barone residence." *Id.* at *3. The court indicated: "Indeed, it is difficult to imagine a scenario in which a husband would secretly create a copy of, and subsequently destroy, a hard drive relating to his spouse's pending legal matters and professional career without any knowledge, support or involvement of his wife." *Id.* Thus, as Plaintiff observes, the court concluded, "Defendant Barone at least had access to or maintained indirect control over the hard drive…" *Id.*

Similarly, the Central District found a plaintiff had sufficient control over evidence where the plaintiff "contracted to store business documents" on computer servers owned by a third-party. *Cyntegra*, 2007 U.S. Dist. LEXIS 97417 at *2-3. After the plaintiff "failed to make payment to maintain the service," "NetNation cleared its servers of Plaintiff's documents at an unknown date soon afterwards." *Id.* at *2. The plaintiff argued it "did not even know the eraser had occurred, until after [the] suit was filed." *Id.* at *14 (emphasis omitted). However, the court found the plaintiff "could direct the flow of information to and from NetNation's servers" until plaintiff stopped payment. *Id.* at *15-16. The court observed, "A relationship with a third-party entity provides, at a minimum, an obligation to make reasonable inquiry of the third party entity for the data at issue." *Id.* at *16 (citations omitted). Thus, the plaintiff could not "abandon[] its documents to a third-party and claim[] lack of control." *Id.* The court concluded, "Plaintiff had sufficient, albeit indirect, control to preserve evidence." *Id.* at *16.

In contrast, the court determined there was no control by a prison healthcare provider where

15

"only senior jail staff and the Sheriff had access to the video-downloading system." *Wilder v. Rockdale County*, 2015 U.S. Dist. LEXIS 49317 at *8, 2015 WL 1724596 (N.D. Ga. Apr. 15, 2015). In *Wilder,* the plaintiff was the surviving spouse of Albert Wilder, who died while in the custody of Rockdale County Jail. *Id.*, at *3. CorrectHealth was a company that provided healthcare services to inmates, and "contracted with the Rockdale County Jail to provide administrative services, nursing and physician care, regularly-scheduled sick call services, medical records management, pharmacy supply and services management, and other related services." *Id.* The plaintiff sought video footage of Mr. Wilder in the jail, including his visit to the medical area. *Id.* at *4. The defendants produced some footage but failed to provide videos that the plaintiff argued was "critical in showing that Defendants denied Mr. Wilder medical care." *Id.* at *5. Thus, the plaintiff requested sanctions for spoliation by the Rockdale County and CorrectHealth. *Id.* at *4-5. The court observed that Rockdale County used "a third-party vendor [that] programmed the detention center's video-recording system to automatically overwrite old video after approximately thirty days." *Id.* at *8. The court concluded that "CorrectHealth did not have control over the video, as only senior jail staff and the Sheriff had access to the video-downloading system." *Id.* at *7-8. Therefore, the court concluded sanctions against the healthcare provider were not appropriate, given the lack of control. *Id.*

The defendants assert that "KCHA— a separate legal entity from the County of Kern — never had any access to, or possession, custody, or control over the video recordings maintained by the Sheriffs Department." (Doc. 90 at 6) Specifically, Ms. Blakely reports she is not, and has not been, "involved with the set up, maintenance, or preservation of any camera or video monitors, equipment, or recordings, if any, either in the infirmary, in the hallways, or in the Pods where inmates' cells are located." (Doc. 90-3 at 2, Blakely Decl. ¶ 2) Further, Margaret Johnson, KCHA Clinical Director of Adult Correctional Services, reports that "KCHA does not own, control, set up, maintain, operate, *have access to, or have custody or possession of* any of the camera or video monitors, equipment, or recordings, if any, in the infirmary, hallways, or the Pods where inmates' cells are located." (Doc. 90-2, Johnson Decl. ¶ 3 (emphasis added)) Thus, the defendants conclude that "KCHA and Blakely never had the opportunity to access, review, or despoil the video footage, nor would they be granted access to review the footage even if they requested it short of a warrant." (Doc. 90 at 8)

16

David Reynolds testified that the County contracted with the vendors controlling the servers storing footage from Lerdo Pre-Trial Facility. (*See* Doc. 90-1 at 52-53, Depo. 23:6-10, 23:25-24:6) Plaintiff implicitly acknowledges the County had *exclusive* control over the video footage, because Plaintiff notes a request from KCHA "to review and preserve footage" would only be granted by the County "*if reasonable*." (*See* Doc. 86 at 10, emphasis added) Notwithstanding Plaintiff's representations, Mr. Reynolds testified that, at most, KCHA "could have viewed something on a monitor, but [its representatives] don't have access to a recording or to burn or obtain or retrieve video from that system." (Doc. 90-1 at 153:20-22) Even if permission was requested by KCHA, Mr. Reynolds stated: "There is no procedure in place to grant… access" to KCHA. (*Id.* at 153-154, Depo. 124:23- 125:6)

In contrast to *Silvestri*, *World Carrier*, and *Centegra*, Plaintiff fails to show that KCHA or its nurses had any access to, or indirect control over, video footage captured at the Lerdo facility. There is no evidence that KCHA had access to the servers for inspection, or even that such access could be granted if requested from the County. *Compare with Silvestri,* 271 F.3d at 591. Further, KCHA—a separate entity from the County—did not have a contract with the vendor controlling the storage of the security footage and could not "direct the flow of information" to the vendor. *Compare Cyntegra* 2007 U.S. Dist. LEXIS 97417 at *2-3 *with Wilder*, 2015 U.S. Dist. LEXIS 49317 at *7-8. Instead, as the Court previously observed, "The County of Kern appears to be the sole party responsible for the videotapes" and "there is no evidence KCHA had possession or control over the videotapes." (*See* Doc. 75 at 4, n. 6) Consequently, the Court finds Plaintiff fails to show KCHA—and its employees, such as Blakely—had control over the evidence claimed to be despoiled. *See Wilder*, 2015 U.S. Dist. LEXIS 49317 at *7-8.

### 3. Duty to preserve

"Although the Ninth Circuit has not precisely defined when the duty to preserve is triggered, trial courts in this Circuit generally agree that, '[a]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.'" Apple, 888 F. Supp. 2d at 991 (quoting *In re Napster*, 462 F. Supp. 2d at 1067).

Plaintiff is unable to establish KCHA had a duty to preserve video evidence from Lerdo

because KCHA had no control over the video footage or servers storing the footage. *See Apple, Inc.*, 888 F. Supp. 2d at 996-97; *see also Wooden v. Barringer*, 2017 U.S. Dist. LEXIS at *20, 2017 WL 5140518 (N.D. Fl. Nov. 6, 2017) ("Defendant… had no duty to preserve the video recordings because he had no control over the video recordings"). For this reason, Plaintiff's motion for sanctions as to the actions of KCHA is denied.

On the other hand, "the County concedes that it had received preservation letters from Plaintiff." (Doc. 91 at 9) The County also "acknowledges… that it had a duty to preserve evidence that existed at the time of the receipt of the preservation letter." (*Id.* at 14) Thus, it is not disputed that the County had a duty to preserve any video footage, to the extent any existed, at the time Plaintiff sent the preservation letters on July 22, 2016. (*See* Doc. 86 at 9, 14)

### 4. Culpable state of mind

"Courts have not been uniform in defining the level of culpability — be it negligence, gross negligence, willfulness, or bad faith — that is required before sanctions are appropriate for evidence destruction." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011) (citing *Victor Stanley v. Creative Pipe, Inc.*, 269 F.R.D. 497, 529-31 (D. Me. 2010)). In the Ninth Circuit, "destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions." *In re Napster*, 462 F. Supp. 2d at 1066. Nevertheless, "a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." *In re Napster*, 462 F. Supp. 2d at 1066-67.

Plaintiff contends this element is satisfied and "the spoliation was willful because … the County … had an abundance of notice that the surveillance footage at issue was relevant to the litigation, as stated in Plaintiff's evidence preservation letters and subsequent tort claim notice." (Doc. 86 at 22) According to Plaintiff, the failure by the County "to retrieve and preserve the footage before it was overwritten constituted willful spoliation." (*Id.*)

The County argues, "Systematic camera or storage failures to not constitute a 'culpable state of mind.'" (Doc. 91 at 71) The Court agrees. Previously, this Court declined to impose sanctions where a plaintiff failed to establish, "beyond his own speculation," that video footage from "was destroyed and not simply lost." *See Harris v. German*, 2019 WL 6700513 at *2 (E.D. Cal. Dec. 5, 2019). There is no showing that the County acted with bad faith—or even in negligence—with the cameras and

video footage from Lerdo Pre-Trial Facility.  As in *Harris*, because there is "no evidence any Defendant destroyed video tapes knowing that they were relevant to this case…, it would be inappropriate to sanction Defendants for spoliation of evidence." *Id.*

### IV.     Conclusion and Order

Based upon the foregoing, the Court **ORDERS**: Plaintiff's motion spoliation sanctions (Doc. 86) is **DENIED**.

IT IS SO ORDERED.

Dated:     **September 28, 2020**                    **/s/ Jennifer L. Thurston**
                                                                                UNITED STATES MAGISTRATE JUDGE