UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA PERRY, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>COUNTY OF KERN, et al.,<br><br>    Defendants. | No.  1:17-cv-01097-KES-CDB<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY BY DEFENDANTS' RETAINED EXPERT, MICHAEL E. GOLD, M.D.<br><br>(Doc. 234) |

This is a civil rights and state tort action brought in connection with the death of Kimberly Morrissey-Scalia on July 1, 2016.  This action is set for trial on plaintiffs' claims for: (1) violations of 42 U.S.C. § 1983, including unlawful seizure, deliberate indifference to decedent's serious medical needs, and interference with familial relationships and right to companionship, against defendant Blakely; (2) *Monell* liability under 42 U.S.C. § 1983, against defendant County of Kern; (3) California Civil Code § 52.1(b) – Civil Rights Violations, against Blakely and County of Kern; and (4) medical negligence, against Blakely and County of Kern.

The Court held oral argument on the parties' motions in limine on April 15, 2025. Doc. 282.  The Court took under submission plaintiffs' motion in limine to exclude certain testimony of defendants' retained expert, Michael E. Gold, M.D.  Doc. 234.  Defendants oppose the motion.  Doc. 251.  For the reasons set forth below and at the hearing, plaintiffs' motion is granted in part and denied in part.

## I. LEGAL STANDARD

A witness who has been qualified as an expert by knowledge, skill, experience, training, or education may give an opinion on scientific, technical, or otherwise specialized topics if (1) the expert's scientific, technical, or other special knowledge will help the trier of fact understand the evidence or determine a fact in issue, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014). The Court serves as a gatekeeper by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993).

"Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science—the focus is on principles and methodology, not conclusions." *Metabolife Int'l, Inc. v. Wornick,* 264 F.3d 832, 841 (9th Cir. 2001). The test of reliability is flexible, and the Court "must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona*, 750 F.3d at 1044. Other factors that might be considered include whether an expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, *see General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997), or whether an expert has adequately accounted for obvious alternative explanations, *see Claar v. Burlington Northern R. Co.,* 29 F.3d 499, 502 (9th Cir. 1994).

The judge should "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). The Court has discretion to decide how to test an expert's reliability based on the type of expert testimony offered. *City of Pomona*, 750

F.3d at 1045. The test is the soundness of the methodology, with the fact finder weighing testimony that meets the threshold established by Rule 702. *Id.* The party offering the expert bears the burden of establishing that Rule 702 is satisfied. *Daubert*, 509 U.S. at 593 n. 10.

## II.   DISCUSSION

Plaintiffs move to preclude defendants' expert, Michael E. Gold, M.D., "from: (1) testifying to any opinions on medical causation that are outside the scope of his expertise; and (2) testifying as to his inadmissible legal conclusions – i.e., [his] legal opinions on ultimate issues of law." Doc. 234. Defendants oppose the motion as to Dr. Gold's medical opinions, arguing that Dr. Gold is well qualified to render the opinions offered in his report, but they do not oppose the motion to the extent it seeks to exclude testimony as to legal conclusions. Doc. 251. Rather, defendants argue that that no expert, including plaintiffs' experts, should opine on an ultimate issue of law. *Id.*

### 1.   Opinions on Medical Causation

Plaintiffs identify two opinions they assert Dr. Gold is unqualified to offer. Doc. 234 at 6. First, they argue that Dr. Gold should not be permitted to opine that Ms. Scalia's death was "due to an end-stage disease process, namely, liver cirrhosis and resultant coagulopathy" because he lacks expertise in those areas. *Id.* Plaintiffs also insist that Dr. Gold's methodology is unclear in this respect. *Id.* Second, for substantially the same reasons, plaintiffs move to exclude the opinion that "[h]ad Ms. Scalia been brought to Kern Medical Center after the first visit to the infirmary following the first fall, it would not have made a difference in the outcome." *Id.*

Defendants accurately briefly summarize Dr. Gold's background:

> Dr. Gold is a physician licensed to practice medicine in the State of California and is Board certified in neurology. He obtained his medical degree from University of Illinois School of Medicine in 1981. He received his California State Medical license in July 1982 and underwent a residency in neurology at UCLA Neuropsychiatric Institute that concluded in 1985. Prior to that, he interned in internal medicine from 1981-1982 at UCLA. He became board-certified by the American Board of Psychiatry and Neurology in 1998. He operated as Section Head of the Department of Neurology at UCLA-Santa Monica Hospital and Medical Center from 1990 to 1996 and was an attending physician in that same department up until 2009. He is an Associate Clinical professor at UCLA Hospital and Neuropsychiatric Institute. One of his more recent lecture

> presentations addressed the subject of addiction. He is a Qualified Medical Examiner for the State of California Worker's Compensation Board.

Doc. 251 at 4; *see also* Doc. 232-4 at 12–19.

Dr. Gold's background, training, and experience sufficiently establishes that he is qualified as an expert in the field of medicine. Although plaintiffs argue that Dr. Gold "is neither a neurosurgeon, nor an emergency medicine physician, nor a hepatologist, nor a hematologist, nor an expert in liver disease, cirrhosis, nor, inter alia, coagulopathy," Doc. 234 at 5, the medical concepts implicated here do not exceed his expertise.[1] "Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor." *Doe v. Cutter Biological, Inc., a Div. of Miles Lab'ys, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992); *see also id.* at n.11 ("Licensure in the discipline or speciality which is the subject of expert opinion is not a requirement under the Federal Rules of Evidence."). Plaintiffs offer no authority to the contrary, and the Court concludes that Dr. Gold is qualified to offer his medical opinions in accordance with Rule 702.

When applying *Daubert* to physicians' testimony, the Ninth Circuit has instructed that such medical expert testimony should be admitted "if physicians would accept it as useful and reliable, but it need not be conclusive because medical knowledge is often uncertain." *Primiano*, 598 F.3d at 565 (internal quotation marks and citation omitted). Given that "[t]he human body is complex, etiology is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof," a litigant need only offer medical expert testimony with a sufficient foundation to be "entitled to have the jury decide upon [the experts'] credibility, rather than the judge." *Id.* at 565–66 (internal quotation marks and citation omitted) (alteration in original).

In *Primiano*, a patient who had received a prosthetic elbow joint following a fall sued the

---

[1] For example, recognizing that chronic alcoholism can negatively impact liver function and that "normal liver function is necessary to manufacture the components of coagulation ('blood clotting')" as Dr. Gold does, Doc. 232-4 at 7, is within the expertise of an experienced physician, and certainly one with Dr. Gold's background in internal medicine and his 42 years of experience as a neurologist.

1  manufacturer, alleging that defects in the components caused metal on metal contact requiring
2  several additional surgeries to correct. *Id.* at 562.  The plaintiff's medical expert, who did not
3  personally examine the plaintiff, opined that the "prosthesis failed to perform in a manner
4  reasonably to be expected by a surgeon using it, because it failed too early." *Id.* at 563.  The
5  district court granted the defendants' motion to exclude the expert's testimony, finding it would
6  not be helpful to the jury. *Id.*  The Ninth Circuit reversed, placing particular emphasis, among
7  other things, on the expert's experience and qualifications. *Id.* at 566, 568.  This was so, based on
8  a "reason[ing] that 'physicians must use their knowledge and experience as a basis for weighing
9  known factors along with the inevitable uncertainties' to make 'a sound judgment' in each case."
10 *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022) (quoting *Primiano*, 598 F.3d
11 at 565–66).  From this principle, several district courts in this circuit have recognized that medical
12 experts may offer opinions based on their own clinical experience. *Witkin v. Lotersztain*, No.
13 219CV0406TLNKJNP, 2022 WL 2276663, at *5 (E.D. Cal. June 23, 2022); *Ladner v. United*
14 *States Gov't*, No. 21CV1953 GPC(KSC), 2023 WL 2899534, at *5 (S.D. Cal. Apr. 11, 2023);
15 *Finkelstein v. Prudential Fin. Inc.*, No. CV-21-00657-PHX-MTL, 2023 WL 6970280, at *11 (D.
16 Ariz. Oct. 23, 2023); *Bordelon v. Airgas USA, LLC*, 603 F. Supp. 3d 946, 955 (D. Or. 2022).

17      In preparing his report, Dr. Gold reviewed relevant evidence including Lerdo Pre-trial
18 Facility records of Ms. Scalia, the Coroner's Report of Eugene Carpenter, Jr., and Kern Medical
19 Center medical records and radiology studies.  Doc. 232-4 at 1.  Dr. Gold's experience as a
20 neurologist is particularly relevant to inform his judgement in this case—where trauma to the
21 head occurred which may have implicated neurological function—and his examination of the
22 medical records and other case-related documents provide a foundation for the opinions
23 expressed in his report.  "[P]hysicians would accept [his testimony] as useful and reliable."
24 *Primiano*, 598 F.3d at 565.

25      In his report, Dr. Gold considered several possible medical causes for Ms. Scalia's death.
26 Doc. 232-4 at 7–10.  For example, he considered brain compression and subsequent herniation,
27 explaining that "[t]he brain and skull are a space of fixed volume and the introduction of any
28 additional space-occupying processes (such as acute blood from a subdural hematoma)

5

1    compresses other brain structures in a global fashion" which "can result in compression of critical
2    cerebral structures, shift the brain contents over and downwards (downward 'herniation' of the
3    brain), and impair the function of vital structures responsible for wakefulness and breathing." *Id.*
4    at 8.  He found that "this condition of brain shift that can cause herniation, although initially
5    suspected, was not evident." *Id.*  He noted that "[b]rain compression and subsequent herniation
6    was not evident as a cause of death at a detailed autopsy." *Id.*

7        Dr. Gold also considered whether Ms. Scalia's subdural hematoma was more consistent
8    with cerebral atrophy due to an underlying condition.  He explained that subdural hematomas can
9    occur in older individuals or those who have "cerebral atrophy[—which] changes the normal
10   venous structures of the brain, which then become more sensitive to being torn (injured) and
11   results in bleeding in the subdural space." *Id.*  Dr. Gold further noted that "subdural hematomas
12   are uncommon in young individuals with normal size brains, and are much more common in
13   alcoholic or older individuals who have brain size shrinkage for a variety of causes including age,
14   chronic alcoholism or other chronic diseases." *Id.* at 8–9.  Dr. Gold considered Dr. Carpenter's
15   autopsy report and deposition testimony detailing Ms. Scalia's chronic alcoholism and liver
16   disease. *Id.* at 10.  Given the additional risk factors discovered in the autopsy, Dr. Gold reasoned
17   that Ms. Scalia's "uncontrollable bleeding while in the hospital is attributable to her cirrhosis."
18   *Id.*

19       Dr. Gold also found that "there is evidence on CT scan and neuroradiology interpretation
20   that part of the subdural hematoma was 'chronic,' indicating that head trauma preexisted prior to
21   [Ms. Scalia's] incarceration." *Id.*  The presence of a chronic subdural hematoma, Dr. Gold
22   reasoned, "indicates that the brain is already at risk for recurrent bleeding, and this additional
23   bleeding can occur spontaneously in the absence of additional head trauma." *Id.*

24       Dr. Gold's findings and analysis provide support for his conclusion that Ms. Scalia's death
25   was not due to "the absence of timely intervention in the treatment of her subdural hematoma,"
26   and that "[h]ad Ms. Scalia been brought to Kern Medical Center after the first visit to the
27   infirmary following the first fall, it would not have made a difference in the outcome." *Id.* 8–10.
28   His opinion is also based in part on Dr. Gold's conclusion that the subdural hematoma would not

1  have initially been recognizable to medical staff without a CT scan. In his report, Dr. Gold relies
2  on these findings and conclusions to support his opinion that "a minor, initially uncomplicated
3  'bump' on the head occurred during the progressive medical deterioration of Ms. Scalia that
4  ultimately resulted in death due to an end-stage disease process, namely, liver cirrhosis and
5  resultant coagulopathy." *Id.* at 9.

6  Dr. Gold's "opinions in this case [were] based on [his] education, training, and experience
7  as a board-certified neurologist" and his review of the relevant records. Doc. 232-4 at 10. As
8  recognized in *Messick* and later reaffirmed in *Hardeman*, an expert's reliance on their own
9  experience can qualify as a scientific basis for their conclusions. *Hardeman v. Monsanto Co.*,
10 997 F.3d 941, 961 (9th Cir. 2021) ("the expert in *Messick* provided a scientific basis for his
11 conclusion by referring to his own extensive clinical experience as the basis for his differential
12 diagnosis, as well as his examination of plaintiff's records, treatment, and history."); *see also*
13 *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014).

14 Under *Daubert*, the district court is tasked with "ensur[ing] that junk science is kept out of
15 the federal courtroom" by acting as a gatekeeper. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d
16 1311, 1321 n.18 (9th Cir. 1995). The judge should "screen the jury from unreliable nonsense
17 opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car,*
18 *Inc.*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the
19 expert is right or wrong, just whether his testimony has substance such that it would be helpful to
20 a jury." *Id.* at 969–70.[2] Dr. Gold's medical opinions meet these gatekeeping tests. Accordingly,
21 plaintiffs' motion to exclude the opinions of Dr. Gold as outside his area of expertise, or lacking
22 proper methodology, is denied.

23 **2. Legal Conclusions**

24 Defendants do not oppose plaintiffs' motion insofar as it seeks to exclude Dr. Gold's
25 testimony as to legal conclusions. Doc. 251 at 6–7. Instead, they request a bilateral order
26 requiring all experts to refrain from using legal conclusions in their testimony. *Id.*

---

[2] Moreover, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

1       Plaintiffs' motion is granted in part, to preclude testimony by Dr. Gold as to legal

2 conclusions.  Under Federal Rule of Evidence 704(a), an opinion is not objectionable just because

3 it embraces an ultimate issue.  Fed. R. Evid. 704(a).  But "an expert witness cannot give an

4 opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *United States v.*

5 *Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (citing *Hangarter v. Provident Life & Accident Ins.*

6 *Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).  However, "it is sometimes impossible for an expert to

7 render his or her opinion on a subject without resorting to language that recurs in the applicable

8 legal standard;" so "if the terms used by an expert witness do not have a specialized meaning in

9 law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the

10 facts of the case, the testimony is not an impermissible legal conclusion." *Id.* at 1198–99.  In a

11 medical negligence claim, for example, "[t]he first element, standard of care, is the key issue" and

12 "can only be proved by expert testimony, unless the circumstances are such that the required

13 conduct is within the layperson's common knowledge." *Lattimore v. Dickey*, 239 Cal. App. 4th

14 959, 968 (2015).

15       Here, medical expert testimony is appropriate to establish medical diagnoses and medical

16 causation.[3]  Dr. Gold may thus offer opinions as to such matters, consistent with his expert report.

17 However, neither Dr. Gold nor other medical experts shall testify at trial as to whether

18 defendants' conduct was deliberately indifferent, reckless, unconstitutional, intentional, or in

19 conscious disregard of the decedent's rights.

20 ///

21 ///

22 ///

---

[3] Also, as noted at the motion in limine hearing, nursing experts may testify as to whether the nursing standard of care was met.  However, expert witnesses may not opine whether the medical care administered in this case was objectively reasonable because such an opinion would reach an ultimate issue of law.  *See Holley v. Gilead Scis., Inc.*, No. 18-CV-06972-JST, 2023 WL 2469632, at *4 (N.D. Cal. Feb. 27, 2023) (collecting cases where experts were permitted to testify about the standard of care or industry standards but precluded from testifying about whether a defendant acted reasonably).

### III. CONCLUSION

Plaintiffs' motion in limine to exclude certain testimony of Michael E. Gold, Doc. 234, is granted in part and denied in part, as set forth above.

IT IS SO ORDERED.

Dated: April 21, 2025

_____
UNITED STATES DISTRICT JUDGE